**EXHIBIT 1**

# COMMONWEALTH OF VIRGINIA



WINCHESTER CIRCUIT COURT
Civil Division
5 NORTH KENT STREET
WINCHESTER VA
(540) 667-5770

Summons

To: SOLACIUM HOLDINGS, LLC          Case No. 840CL20000748-00
CT CORPORATION SYSTEM
4701 COX RD., STE. 285
GLEN ALLEN VA 23060-6808

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Friday, December 18, 2020

Clerk of Court:  WILLIAM D GARDNER

by _____
(CLERK/DEPUTY CLERK)

Instructions:    PLEASE SERVE COMPLAINT

Hearing Official:

Attorney's name:    BAUGHER, ANDREW S
90 NORTH MAIN STREET
SUITE 20
HARRISONBURG VA 22803

VIRGINIA:    IN THE CIRCUIT COURT FOR THE CITY OF WINCHESTER

NEW LIFESTYLES, INC.,

and

CUAVE FAMILY PROPERTIES, LLC,

and

PROPERTIES OF WINCHESTER, LLC,

     Plaintiffs,

v.                                     Case No._____

CALO YOUNG ADULTS – WINCHESTER, LLC,

     Serve: CT Corporation System
           4701 Cox Rd., Ste. 285
           Glen Allen, VA 23060-6808

and

SOLACIUM HOLDINGS, LLC,
d/b/a
EMBARK BEHAVIORAL HEALTH,

     Serve: CT Corporation System
           4701 Cox Rd., Ste. 285
           Glen Allen, VA 23060-6808

     Defendants.

FILED
WINCHESTER CIRCUIT COURT
WILLIAM D. GARDNER, CLERK
2020 DEC 18  PM 1: 31

## **COMPLAINT**

     Plaintiffs New Lifestyles, Inc. ("New Lifestyles"), Cuave Family Properties, LLC

("Cuave Family Properties"), and Properties of Winchester, LLC ("Properties of Winchester"),

by counsel, for their Complaint against Defendants Calo Young Adults – Winchester, LLC

1

("Calo") and Solacium Holdings, LLC d/b/a Embark Behavioral Health ("Embark"), state as follows:

## NATURE OF ACTION

1.     This action is for breach of lease and related property damage. Plaintiffs own certain historic properties in Winchester, Virginia, which were leased to Calo for use as a residential treatment program and office space. These programs were owned, operated, or managed by Embark with knowledge of the lease and through its own use and possession of the premises.

2.     Calo and Embark caused significant damage to the properties. This action seeks redress against Calo and Embark.

## PARTIES

3.     New Lifestyles is a Virginia corporation with a principal place of business in Florida. Kenneth L. Cuave, PsyD ("Dr. Cuave"), is the President of New Lifestyles.

4.     Cuave Family Properties is a Virginia limited liability company with a principal place of business in Winchester, Virginia. Dr. Cuave is the sole member of Cuave Family Properties and he is a resident of Florida.

5.     Properties of Winchester is a Virginia limited liability company with a principal place of business in Winchester, Virginia. Dr. Cuave is the sole member of Properties of Winchester and he is a resident of Florida.

6.     Calo is a Delaware limited liability company with a principal place of business in Tempe, Arizona. Upon information and belief, no member of Calo is a resident of Virginia.

7.     Solacium Holdings, LLC is a Delaware limited liability company with a principal place of business in Tempe, Arizona. Solacium does business under the Embark name, which is

registered as a fictitious name in Virginia for Solacium. Upon information and belief, no member of Solacium is a resident of Virginia.

## JURISDICTION & VENUE

8.      This Court has subject matter jurisdiction pursuant to Va. Code § 17.1-513.

9.      This Court has personal jurisdiction over Calo and Embark pursuant to Va. Code § 8.01-328.1 because, *inter alia*, this cause of action arises from Calo and Embark, acting either directly or through an agent, transacting business in the Commonwealth, causing tortious injury by an act or omission in the Commonwealth, and/or having an interest in, using, or possessing real property in the Commonwealth.

10.     Venue is proper in this Court pursuant to Va. Code § 8.01-262(4) because the cause of action arose in Winchester, Virginia.

## FACTS

11.     Properties of Winchester owns the real property and improvements located at 303 Amherst Street, Winchester, Virginia ("303 Amherst") and 304 Amherst Street, Winchester, Virginia ("304 Amherst"). Properties of Winchester also owned the real property and improvements located at 309 Amherst Street, Winchester, Virginia ("309 Amherst") during the relevant time.

12.     Cuave Family Properties owned the real property and improvements located at 230 West Boscawen Street, Winchester, Virginia ("230 West Boscawen," and together with 303 Amherst, 304 Amherst, and 309 Amherst, the "Premises") during the relevant time.

13.     New Lifestyles acted as the managing agent for Properties of Winchester and Cuave Family Properties in leasing the Premises to Calo.

3

14. Calo entered a "Standard Commercial Lease," dated November 30, 2015, with New Lifestyles for each property (collectively, the "Leases"), under which New Lifestyles leased the Premises to Calo. A true copy of each lease is attached hereto as Exhibit 1A, Exhibit 1B, Exhibit 1C, and Exhibit 1D, respectively.

15. Although Calo did not formally sign the Leases, Calo received the Leases, acknowledged and ratified the Leases, and performed under the Leases by accepting possession of the Premises and paying rent thereunder, and knew that the terms of the Leases governed its possession and use of the Premises.

16. Properties of Winchester is a party to the leases for 303 Amherst, 304 Amherst, and 309 Amherst as their "Owner" and is a third-party beneficiary of those leases.

17. Cuave Family Properties is a party to the lease for 230 West Boscawen as its "Owner" and is a third-party beneficiary of that lease.

18. Calo used the Properties for a residential treatment program and office space. The program was designed for young adults with mild to moderate mental health issues.

19. Embark owned, acquired, or operated the "Calo Programs," which are various residential treatment facilities.

20. The services provided by Calo and its use of the Premises were part, and in furtherance, of the "Calo Programs" owned and operated by Embark.

21. Embark owned, acquired, had an interest in, or operated a similar program called "Fulshear Treatment to Transition."

22. Embark partnered with Calo to operate "Fulshear Treatment to Transition East" at the Premises, and Calo became known as "Fulshear Treatment to Transition East" and programs operated at the Premises were operated under this name for Embark's benefit.

4

23.     Calo began communicating with New Lifestyles and holding itself out as "Fulshear Treatment to Transition East."

24.     During the relevant time, Alex Stavros was President, CEO, and Chairman of Calo, and he was also the CEO of Embark.

25.     Upon information and belief, Calo and Embark have common ownership, management, or employees, work together out of the same principal place of business and office in Arizona, and Embark paid, managed, and directed the employees responsible for the programs conducted at the Premises.

26.     Mr. Stavros, on behalf of Embark and Calo, communicated with New Lifestyles about the Leases and their use of the Premises, and Embark made payments to New Lifestyles under the Leases and took other actions that demonstrated that Embark was assuming the obligations under the Leases or acting as agent for Calo in performing under the Leases and using the Premises to provide services for the benefit of Calo and Embark.

27.     The initial term of the Leases ended December 31, 2018, and then automatically renewed for one-year terms thereafter. The Leases for 303 Amherst and 309 Amherst were terminated December 31, 2019, and the Leases for 304 Amherst and 230 Boscawen were terminated February 10, 2020, by agreement.

28.     The Leases contained the following terms and obligations:[1]

   • Section 1. The Premises include furniture and equipment and that is being included in the lease hereunder. Such furniture and equipment shall remain the property of the Landlord. **Tenant shall maintain such furniture and equipment in good condition** and replace the same if broken.

   • Section 2. **Tenant shall not commit or allow any waste, nuisance, or other such act or omission to occur on the Premises,** and shall not do any act or

---

[1] Relevant provisions in **bold**.

5

allow on the Premises any condition which may disturb the quiet enjoyment of other tenants of the Building or those occupying surrounding properties.

• **Section 5.** Tenant has inspected and knows the condition of the Premises, and accepts the same in their present condition.

• **Section 9.4. Tenant shall promptly pay all bills for labor done or material or equipment supplied for any construction or repair work** done on the Premises.

• **Section 10. Tenant shall have the obligation of maintaining the roof, downspouts, exterior walls and foundation** of that portion of the Building constituting the Premises.... **Tenant shall be responsible for all window glass replacement.... Tenant shall be responsible for all cleaning and janitorial services within the Premises,** and Landlord shall have **no responsibility** therefor.... Landlord shall have **no responsibility** for any repairs/improvements unless such damage is caused by Landlord.

• **Section 11.1. At its sole expense,** Tenant may ... make improvements, alterations or additions to the Premises.... **Tenant agrees to obtain all necessary consents, licenses, approvals, and authorizations of any such governmental authorities** or utility providers prior to undertaking any such work.

• **Section 11.2.** Tenant shall promptly pay all bills and expenses resulting from any such improvements, alterations or additions. **Tenant shall defend and indemnify Landlord** and its managers and agents **from and against any and all claims, losses, costs, expenses, and liabilities arising as a result of or in connection with any work done on or related to the Premises....**

• **Section 20.1.** Tenant **will be in default** under this Lease upon the happening of any one or more of the following events: .... (a) Failure of Tenant ... **to fully perform any obligation contained in this Lease.**

• **Section 23.1.** At the termination of this Lease, **Tenant agrees to deliver to Landlord the Premises** and all mechanical systems and all equipment and fixtures thereon **in good working order and condition.**

29.     Calo and Embark breached these obligations and terms, including by not maintaining equipment in good condition; allowing waste to occur on the Premises; failing to promptly pay for labor and material required to repair the damages; failing to maintain the roof, downspouts, exterior walls and foundation; failing to pay for necessary cleaning services; failing

to obtain necessary permits and approvals before making alterations; and not delivering the Premises in good working order and condition at the termination of the Leases.

30.     Calo and Embark allowed dogs to urinate inside the buildings at 230 West Boscawen and 304 Amherst and did not clean up the urine properly. The urine soaked through the carpets of 230 West Boscawen and damaged the floors, and urine also damaged the floors at 304 Amherst. These properties reeked of urine and also contained fleas upon termination of the Leases.

31.     Calo and Embark did not properly maintain the roof and gutters of 230 West Boscawen, which caused significant water intrusion and major structural damage to the building. Calo and Embark allowed the gutters to fill with dirt and debris so they were no longer functioning, and also permitted active leaks throughout the roof. The resulting water damage caused growth of black mold, rot, and deterioration of the structure.

32.     Calo and Embark did not keep the gutters at 303 Amherst clean and free of debris, which caused overflow during rain events and significant water intrusion and damage to the building.

33.     Calo and Embark did not properly maintain the roof and gutters at 304 Amherst, which caused significant water intrusion and damage to the building, including major structural damage. The gutters were filled with debris and clogged and no longer drained properly, and the roof was damaged. The fascia rotted in numerous areas; lattice around the porch was damaged; storm windows were broken or missing glass; the exterior wood siding deteriorated; the soffit was damaged; the entry porch deteriorated and at least one of the columns failed; the porch stairs rotted; and two skylights had active leaks.

34. Calo and Embark installed a parking lot at 304 Amherst without obtaining permits or approvals. The City of Winchester required Properties of Winchester to remove the parking lot at its expense.

35. In addition, the interior of each building needed to be repainted; Calo and/or Embark removed and took lawnmowers, trimmers, snowblowers and other equipment from the Premises without permission; and Cuave Family Properties and Properties of Winchester had stored boxes in the attic, which Calo and/or Embark went through and removed certain items, including pictures and other belongings without permission.

36. 230 Boscawen sustained property damage as a result of Calo and Embark's acts and omissions, in the amount of $44,287.67, and New Lifestyles paid $4,376.67 to remedy part of this damage before 230 Boscawen was sold. The property could not be rented for a period as a result of the damage, and Cuave Family Properties subsequently sold 230 Boscawen in "as is" condition on October 13, 2020. The sale price was approximately $85,500 less than it would have been had Embark and Calo not damaged the property, and New Lifestyles also lost rent in the approximate amount of $5,000 per month between the termination of the Lease and the sale.

37. 303 Amherst sustained property damage as a result of Calo and Embark's acts and omissions, in the amount of $18,199.00. The property is unable to be rented until the repairs are complete.

38. 304 Amherst sustained property damage as a result of Calo and Embark's acts and omissions in the amount of $23,448.61. The property is unable to be rented until the repairs are complete.

39. 309 Amherst sustained property damage as a result of Calo and Embark's acts and omissions in the amount of $10,816.20, and New Lifestyles paid $6,867.20 to repair part of the

8

damage before 309 Amherst was sold. The property could not be rented for a period, and Properties of Winchester subsequently sold 309 Amherst in "as is" condition on November 23, 2020. The sale price was approximately $25,000 less than it would have been had Embark and Calo not damaged the property, and New Lifestyles also lost rent in the approximate amount of $2,500 per month between the termination of the Lease and the sale.

**Count I – Breach of Lease for 230 West Boscawen**
**(New Lifestyles and Cuave Family Properties against Calo and Embark)**

40.     Plaintiffs incorporate the above allegations.

41.     Calo leased 230 West Boscawen from Cuave Family Properties and New Lifestyles.

42.     Embark assumed the lease and was in possession of the premises, and acted as an agent of Calo in operating the programs at the premises and performing under the lease.

43.     New Lifestyles fully performed under the lease.

44.     Calo and Embark breached the lease.

45.     Embark authorized, directed, participated in, approved, and ratified Calo's conduct.

46.     New Lifestyles has been damaged in the amount of $4,376.67 as a result of Calo and Embark's breach of the lease and for the property damage they caused, plus lost rent in the amount of $5,000 per month from February 10, 2020 to October 13, 2020.

47.     Cuave Family Properties has been damaged in the approximate amount of $85,500 as a result of Calo and Embark's breach of the lease and for the property damage they caused.

48.     Calo and Embark are responsible for New Lifestyle's expenses, including its attorney's fees, in enforcing the lease per Section 20.6.

9

### Count II – Breach of Lease for 303 Amherst
### (New Lifestyles against Calo and Embark)

49. Plaintiffs incorporate the above allegations.

50. Calo leased 303 Amherst from Properties of Winchester and New Lifestyles.

51. Embark assumed the lease and was in possession of the premises, and acted as an agent of, Calo in operating the programs at the premises and performing under the lease.

52. New Lifestyles fully performed under the lease.

53. Calo and Embark breached the lease.

54. Embark authorized, directed, participated in, approved, and ratified Calo's conduct.

55. New Lifestyles has been damaged in the amount of $18,199 as a result of Calo and Embark's breach of the lease and for the property damage they caused, plus lost rent of approximately $2,500 per month from December 31, 2019 until the property can be rented or sold.

56. Calo and Embark are responsible for New Lifestyle's expenses, including its attorney's fees, in enforcing the lease per Section 20.6.

### Count III – Breach of Lease for 304 Amherst
### (New Lifestyles against Calo and Embark)

57. Plaintiffs incorporate the above allegations.

58. Calo leased 304 Amherst from New Lifestyles.

59. Embark assumed the lease and was in possession of the premises, and acted as an agent of, Calo in operating the programs at the premises and performing under the lease.

60. New Lifestyles fully performed under the lease.

61. Calo and Embark breached the lease.

10

62.     Embark authorized, directed, participated in, approved, and ratified Calo's conduct.

63.     New Lifestyles has been damaged in the amount of $23,448.61 as a result of Calo and Embark's breach of the lease and for the property damage they caused, plus lost rent of approximately $2,500 per month from February 10, 2020 until the property can be rented or sold.

64.     Calo and Embark are responsible for New Lifestyle's expenses, including its attorney's fees, in enforcing the lease per Section 20.6.

### Count IV – Breach of Lease for 309 Amherst
**(New Lifestyles and Properties of Winchester against Calo and Embark)**

65.     Plaintiffs incorporate the above allegations.

66.     Calo leased 304 Amherst from New Lifestyles.

67.     Embark assumed the lease and was in possession of the premises, and acted as an agent of Calo in operating the programs at the premises and performing under the lease.

68.     New Lifestyles fully performed under the lease.

69.     Calo and Embark breached the lease.

70.     Embark authorized, directed, participated in, approved, and ratified Calo's conduct.

71.     New Lifestyles has been damaged in the amount of $6,867.20 as a result of Calo and Embark's breach of the lease and for the property damage they caused, plus lost rent in the approximate amount of $2,500 per month from December 31, 2019 to November 13, 2020.

72.     Properties of Winchester has been damaged in the approximate amount of $25,000 as a result of Calo and Embark's breach of the lease and for the property damage they caused.

11

73.     Calo and Embark are responsible for New Lifestyle's expenses, including its attorney's fees, in enforcing the lease per Section 20.6.

## Count V – Waste
### (All Plaintiffs against All Defendants)

74.     Plaintiffs incorporate the above allegations.

75.     "Any tenant of land ... who commits any waste while he is in possession of such land ... shall be liable for damages." Va. Code § 8.01-178.1(A). "[W]aste is defined as a destruction or material alteration or deterioration of the freehold, or of the improvements forming a material part thereof, by any person rightfully in possession, but who has not the fee title or the full estate." *Chosar Corp. v. Owens*, 235 Va. 660, 663 (1988). If the waste is permitted through wanton misconduct, as occurred here, then the damages are automatically doubled. Va. Code § 8.01-178.2.

76.     Calo and Embark were tenants of or in possession of the Premises.

77.     Calo and Embark committed waste and substantial damages to the Premises.

78.     The damage to 230 West Boscawen as a result of Defendants' waste is approximately $129,376.67.

79.     The damage to 303 Amherst as a result of Defendants' waste is approximately $18,199.00, plus lost rent of $2,500 per month beginning December 31, 2019.

80.     The damage to 304 Amherst as a result of Defendants' waste is approximately $23,448.61, plus lost rent of $2,500 per month beginning February 10, 2020.

81.     The damage to 309 Amherst as a result of Defendants' waste is approximately $56,867.20.

82.     Calo and Embark knew of the ongoing damage occurring to the Premises and told New Lifestyles that maintenance was being performed, but it either was not being performed or

was not performed in a manner that would prevent the damage from continuing and causing waste.

83.     Defendants committed the waste through wanton misconduct, and the damages should be doubled.

### Count VI – Negligence / Gross Negligence
**(Cuave Family Properties and Properties of Winchester against Embark)**

84.     Plaintiffs incorporate the above allegations.

85.     Embark had an independent duty of care toward the owners of the Premises, Cuave Family Properties and Properties of Winchester, to not damage the Premises.

86.     Embark, through the negligent acts and omissions of its employees, agents, and servants, breached this duty by causing damage to the Premises.

87.     Embark acted in a grossly negligent manner. It was aware of and permitted the significant and continuing damage to the Premises with conscious disregard of the rights of the owners.

88.     Cuave Family Properties and Properties of Winchester have suffered damage as a result.

### Count VII – Conversion
**(Cuave Family Properties and Properties of Winchester against Calo and Embark)**

89.     Plaintiffs incorporate the above allegations.

90.     Calo and/or Embark removed and took lawnmowers, trimmers, snowblowers and other equipment from the Premises without permission; and Cuave Family Properties and Properties of Winchester stored boxes in the attic, which Calo and/or Embark went through and removed certain items, including pictures and other belongings without permission.

13

91.     Calo and/or Embark wrongfully exercised dominion and control over these items and have failed to return them to their owners.

92.     These acts were taken with conscious disregard of the rights of the owners.

93.     Cuave Family Properties and Properties of Winchester have suffered damages as a result.

**Jury Demand**

94.     Plaintiffs demand trial by jury for all claims and issues so triable.

WHEREFORE, Plaintiffs move for judgment against Defendants, jointly and severally, in the amount of $250,000, or such amount as proven at trial, plus lost rental value of $5,000 per month for 303 and 304 Amherst from the termination of the leases until the properties can be re-let or sold, together with double damages for waste under Count V, punitive damages under Counts VI and VII of $150,000, reasonable expenses, including attorney's fees, under Counts I – IV, and such additional relief the Court deems proper.

NEW LIFESTYLES, INC.,
and
CUAVE FAMILY PROPERTIES, LLC,
and
PROPERTIES OF WINCHESTER, LLC,
By Counsel

ANDREW S. BAUGHER (VSB #74663)
CHRISTOPHER R. TATE (VSB #91987)
Flora Pettit PC
90 North Main Street, Suite 201
P. O. Box 1287
Harrisonburg, Virginia 22803
Tel: (540) 437-3138
Fax: (540) 437-3101
asb@fplegal.com
crt@fplegal.com
*Counsel for Plaintiffs*

14

## CERTIFICATE

I hereby certify that on December 17, 2020, a true copy of the foregoing Complaint was mailed to:

Calo Young Adults – Winchester, LLC
c/o CT Corporation System, Registered Agent
4701 Cox Rd., Ste. 285
Glen Allen, VA 23060-6808

Solacium Holdings, LLC, d/b/a Embark Behavioral Health
c/o CT Corporation System, Registered Agent
4701 Cox Rd., Ste. 285
Glen Allen, VA 23060-6808

*Counsel for Plaintiffs*

868963

15

## STANDARD COMMERCIAL LEASE

THIS LEASE ("Lease") is made this 20th day of November, 2015, by and between NEW LIFESTYLE, INC., a Virginia corporation (hereinafter "Landlord") and CALO YOUNG ADULTS - WINCHESTER, LLC, a Delaware limited liability company (hereinafter "Tenant"), and PROPERTIES OF WINCHESTER, LLC ("Owner").

1.  **Leased Premises.** Landlord leases to Tenant, and Tenant leases from Landlord, the following described premises and all the improvements situated on the premises (hereinafter, in whole or in part, the "Premises"), in the City of Winchester, Virginia:

| Property | Tax Map Number | Permitted Use | Monthly Rent |
|---|---|---|---|
| 303 Amherst Street | 172-01-D-2 | Residential | $ 2,370 |

See Exhibit A for additional description of the Premises – with Exhibit "A" attached hereto and incorporated herein by this reference, with such property hereinafter referred to as the "Premises" and the improvements hereinafter referred to as the "Building."

The Premises include furniture and equipment and that is being included in the lease hereunder. Such furniture and equipment shall remain the property of the Landlord. Tenant shall maintain such furniture and equipment in good condition and replace the same if broken. If Tenant no longer desires any such furniture and equipment to remain in the Premises, Tenant shall notify Landlord of the same and Landlord shall have 10 business days to remove the same.

2.  **Use.** The Premises shall be used only for a young adult transitional program and associated uses related thereto – with the permitted use the Premises set forth in Section 1 above. The Premises shall not be used for any other purpose without Landlord's prior written consent. Tenant shall not commit or allow any waste, nuisance, or other such act or omission to occur on the Premises, and shall not do any act or allow on the Premises any condition which may disturb the quiet enjoyment of other tenants of, the Building or those occupying surrounding properties. Tenant shall comply with all laws in its usage of such properties and if changes are required to such use, Tenant shall be responsible for the same.

24833512v1

- 1 -



3.     **Base Rent.**

3.1.    **Base Rent Amount.** Tenant agrees to pay as Monthly Base Rent for each property in the amounts set forth above, payable in advance on the fifth day of each calendar month during the term of this Lease.

3.2.    **Late Payments.** Any rent payments received by Landlord more than five (5) days late shall bear a late payment fee of $100 per property rent that is late, and interest from the dates they are due until the dates they are paid, at an annual rate equal to two percentage points over the prime rate as announced from time to time in *The Wall Street Journal*, recomputed and modified on the first day of each and every calendar month. In the event the above publication is no longer published, then Landlord shall choose another generally accepted and widely published prime rate.

3.3.    **Annual Increases.** The amount of the Base Rent shall be increased once each third lease year, as of the first day of the first month of the Lease year, by three percent (3%) over the amount thereof for the preceding three lease years, including renewal terms. The new Base Rent amount shall be payable beginning with the first month of the lease year, without the requirement of any notice from Landlord to Tenant.

4.     **Term.**

4.1.    **Initial Lease Term.** This Lease shall be for an initial term of three years and 41 days, commencing November 20, 2015, and ending at midnight on December 31, 2018.

4.2.    **Automatic Renewal.** If this Lease is in force on the expiration date of the initial term, and if the Tenant on that date has fully performed all its obligations under this Lease, this Lease shall automatically renew for one year terms thereinafter. This automatic renewal option shall continue from year to year until terminated by written notice from Tenant to Landlord no later than thirty (30) days prior to the expiration of the then-current term. The same terms which apply during the initial term shall apply during the extension.

5.     **Condition of Premises.** Tenant has inspected and knows the condition of the Premises, and accepts the same in their present condition. By its execution of this Lease, Tenant acknowledges that Landlord has made no warranties, representations or statements whatsoever concerning any condition or matter relating to the Premises, including such matters as the income or expenses of the Premises, title to the Premises, legal status of the Premises, availability or cost of utilities, or physical condition of the Premises or any improvements thereon. Tenant further acknowledges that no agents, employees, brokers or other persons are authorized to make any representations or warranties for Landlord. Landlord has relied upon these acknowledgments as a material inducement to enter into this Lease. Tenant is hereby leasing the Premises "as is" and "where is" and agrees that it relies upon no warranties, representations or statements by Landlord or any other persons for Landlord in entering into this Lease. Tenant

- 2 -

24833512v1

acknowledges that there is in and about the Premises nothing dangerous to life, limb, health or property, and Tenant hereby knowingly and deliberately waives any claim for damages which it may have against Landlord that may arise from any defects in or about the Premises after the execution hereof.

6.     **Utilities.** Tenant shall be responsible for any and all utility and service costs of the Premises, including, without limitation, all charges for gas, water, electricity, sanitary sewer, telephone, cable television, internet access, trash removal and any other utilities or similar services used at or in connection with the Premises.

7.     **Tenant's Taxes.** Tenant shall timely pay or cause to be paid when due all real estate, personal property, sales, use and other taxes or assessments, general or special, now or hereafter imposed by any federal, state, or local government on the Tenant's property located in or used in connection with the Premises or on the ownership, lease, sale, possession or use of the Premises, whether the same are assessed against Landlord or Tenant. If any such tax is assessed against Landlord, Landlord shall provide Tenant with written notice of the assessment.  Upon demand Tenant shall provide Landlord with proof of all required payments.

8.     **Insurance.**

8.1.     **Fire and Extended Coverage.** Landlord shall obtain "all risk" (sometimes called "open perils" or "special perils") fire and extended coverage insurance on the Building, including fixtures and non-removable tenant improvements, in such amount as Landlord deems sufficient. Tenant shall cooperate with Landlord so that the lowest insurance rating can be obtained, given the use and condition of the Premises. Accordingly, Tenant shall fully cooperate with the insurance carrier in implementing any measures or complying with any requirements the carrier may have. All costs of such measures or compliance shall be borne by Tenant. If the insurance rates published by the Insurance Service Office of the State of are increased as the result of any activities or hazards introduced by Tenant, then Tenant shall pay the incremental cost thereof promptly upon demand.

8.2.     **Liability.** At its sole cost and expense, Tenant shall purchase and maintain commercial general liability insurance on the Premises, including a property damage provision, insuring against liability for injury to persons or property occurring on or about the Premises or arising out of the ownership, maintenance, use or occupancy of the Premises. The insurance shall be in an amount not less than One Million Dollars ($1,000,000) combined single limit per occurrence, and a general policy aggregate of not less than Two Million Dollars ($2,000,000) if such aggregate applies to this policy.

8.3.     **Policy Requirements.** All policies of insurance obtained now or at any future time by Tenant, shall name Landlord, as well as Tenant, as an insured, by means of a separation of insureds clause, sometimes also called a "severability of insureds" or "cross liability" clause. The policies shall also provide that Landlord be given at least thirty (30) days' notice before any cancellation or material modification of the policy.

- 3 -

24033512v1

**8.4.    Certificates of Insurance.**  Tenant shall furnish to Landlord certificates of insurance evidencing the insurance coverage required by these provisions, and providing that Landlord shall receive thirty (30) days' notice of cancellation or material change in coverage.  Within thirty (30) days after each premium payment date Tenant shall furnish Landlord with a copy of the premium bill and evidence of payment.

**8.5.    Casualty Damage; Claims.**  In the event of casualty damage to the Premises, and if Landlord is carrying the all-risk property insurance, Tenant shall immediately report the damage to Landlord and Landlord shall make whatever claim against the insurance company that Landlord deems advisable.  Tenant shall cooperate in connection with the claim and shall be bound by Landlord's actions.  In the event of either damage to the Premises by casualty or an assertion of liability, and if Tenant is carrying the applicable insurance policy, Tenant shall immediately report the same to the applicable insurance company and make a claim for insurance proceeds, delivering to Landlord a copy of the claim.  Landlord may take such action as it deems necessary regarding the claim, and Tenant shall reimburse Landlord for all of Landlord's costs in connection with Landlord's action, including without limitation any attorney's fees expended by Landlord.  Any insurance proceeds shall be paid to Landlord and may be disbursed as Landlord in its sole discretion deems appropriate.

**9.    Liens and Encumbrances.**

**9.1.    Subordination.**  This Lease shall be and hereby is made subject and subordinate to any present or future mortgages, deeds of trust, and other liens or encumbrances executed or consented to by Landlord which do not materially affect Tenant's use of the Premises.  The holder of any such lien or encumbrance may notify Tenant in writing of its interest, and in such event Tenant shall send copies of all notices or communications regarding this Lease to the holder of the lien or encumbrance.  Such holder shall be entitled to take any action or exercise any rights reserved to Landlord under this Lease.

**9.2.    No Further Encumbrance.**  Tenant shall not encumber or permit the encumbrance of Premises or this leasehold estate by any mortgage, deed of trust, assignment, collateral assignment, security interest, lien or other charge.  If any encumbrance to which Landlord has not consented is created or filed of record against the Premises or this leasehold estate, Tenant shall discharge or cause the discharge of the same within ten days after its creation.  Tenant shall defend and indemnify Landlord from all liability, damages and expenses incurred by Landlord which result from any such encumbrance.

**9.3.    No Mechanic's Liens.**  This Lease does not require Tenant to improve the Premises or construct any improvements or additions on the Premises.  Any improvements or additions to the Premises which Tenant might make or permit are for the sole use of Tenant and will not benefit Landlord's reversion.  Tenant is not, and shall not be deemed to be, the agent of Landlord in contracting or arranging for any improvement of the Premises or any construction on the Premises.

- 4 -

24833512v1

**9.4.    Indemnification.**  Tenant shall promptly pay all bills for labor done or material or equipment supplied for any construction or repair work done on the Premises. Failure to promptly pay any such bills shall be a default under this Lease. Tenant shall defend and indemnify Landlord from all liability, damages or expense resulting from any mechanic's lien claims affecting the Premises.

**10.    Maintenance and Repair.**  Tenant shall have the obligation of maintaining the roof, downspouts, exterior walls and foundation of that portion of the Building constituting the Premises, and shall also repair and maintain the general building plumbing, heating, electrical, air conditioning and ventilation systems and equipment which serve the Premises, including any such systems or equipment located outside the Premises but which exclusively serve the Premises.    Tenant shall also maintain in good order and repair all improvements, alterations and additions which Tenant may make to the Premises, including any alterations to the Building which were made in the installation thereof, including roof and wall penetrations. In addition and without limitation, Tenant shall protect water pipes, heating and air conditioning equipment, plumbing, fixtures, appliances, and sprinkler systems serving the Premises from becoming frozen or damaged by other than ordinary wear and tear. Tenant shall be responsible for all window glass replacement and for maintenance of light fixtures and lamps throughout the Premises. Tenant shall be responsible for all cleaning and janitorial services within the Premises, and Landlord shall have no responsibility therefor. Tenant shall keep the parking lot adjacent to the Premises and all sidewalks, alleys, walkways and asphalted or concrete areas of the Land which serve the Premises clean, sightly, and free of snow and rubbish, and shall keep and maintain the same in good condition, repairing cracks and potholes and replacing the asphalt or concrete when needed.

Landlord shall have no responsibility for any repairs/improvements unless such damage is caused by Landlord.

**11.    Tenant Improvements and Alterations.**

**11.1.    Tenant's Rights.**  At its sole expense, Tenant may, but is not required to, make improvements, alterations or additions to the Premises, subject to Landlord's prior approval, which shall not be unreasonably withheld.    Any improvements, alterations or additions shall be of good workmanship and material and shall not reduce the size or strength of the then existing improvements or of any load bearing wall or structural support.    Landlord makes no representation or warranty concerning whether any such work is permitted by the applicable laws, ordinances, rules and regulations of any applicable governmental authority. Tenant agrees to obtain all necessary consents, licenses, approvals, and authorizations of any such governmental authorities or utility provider s prior to undertaking any such work.

**11.2.    Payment of Costs; Indemnity.**  Tenant shall promptly pay all bills and expenses resulting from any such improvements, alterations or additions. Tenant shall defend and indemnify Landlord and its managers and agents from and against any and all claims, losses, costs, expenses, and liabilities arising as a result of or in connection with any work done on or related to the Premises, including any claims for

- 5 -

damage or injury, and any mechanic's lien claims.  Tenant shall fully pay and satisfy any mechanic's liens which may be filed against the Building or any portion of the Land as a result of any of Tenant's work.

        **11.3.   Ownership of Improvements; Removal.**  Any improvements, alterations, additions or fixtures placed on the Premises, whether or not permanently affixed to the Premises, shall become a part of the realty, shall belong to Landlord, and shall remain on and be surrendered with the Premises at the termination of this Lease. No improvements, alterations or additions to the Premises shall be removed without Landlord's prior written consent, although upon Landlord's request Tenant shall remove, at the termination of this Lease, any such improvements, alterations and additions which Landlord may specify.  Tenant shall repair all damage caused by any removal, including any damage caused by wall or roof penetrations.

12.      **Assignment or Sublease.**

        **12.1.**   Tenant shall not assign this Lease, sublease the Premises or any part thereof, or allow anyone else to use or occupy any part of the Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed.  The parties agree that, in determining whether to grant consent, Landlord may take into consideration the net worth or other creditworthiness of the proposed assignee or subtenant, the nature of such party's proposed use of the Premises or portion thereof, such party's general business reputation and character, the impact which the proposed assignment or sublease would have upon other tenants of the Building or the future value of the Building, and other such factors. Notwithstanding the above, Tenant shall not be required to obtain Landlord's consent in the event that Tenant is sold to a third party or Tenant forms a new entity, which is controlled by Tenant or its affiliates. However, no assignment/sublease shall in any way relieve Tenant of its obligations under this lease.

        **12.2.   Assignment by Landlord.**  Landlord may assign this Lease to any subsequent purchaser of the Building or any other entity owned by Kenneth Cuave, and upon such assignment Landlord shall be released from all rights and obligations under the Lease, except for any such rights or obligations accruing and unperformed prior to the date of the sale.

13.     **Right of First Refusal of Tenant to Purchase Building or Lease Additional Space.**  If at any time during the life of this Lease, including any renewal terms, Landlord receives an offer from a third person for the purchase of the Building or for the leasing of any portion of the Building (other than the Premises) to a party which is not a current tenant of the Building or a party related to a current tenant of the Building, and if Landlord desires to accept the offer, then Landlord shall promptly deliver to Tenant a copy of the offer (if written) or a letter setting forth the terms of the offer (if verbal), and Tenant may within fifteen (15) days thereafter elect to purchase or lease the Building or portion thereof on the same terms as those set forth in the offer.  Should Tenant not exercise its right to purchase or lease the Building or portion thereof, and if Landlord does not sell or lease the Building or portion thereof to the third party, then Tenant shall continue to have this right of first refusal in connection with subsequent

- 6 -

offers. If Landlord sells or leases the Building or portion thereof after Tenant's election not to exercise this right, then the sale (if the transaction is a sale) shall be subject to this Lease. If Landlord leases only a portion of the Building, then this right of first refusal shall continue to exist with respect to the remaining portions of the Building.

14.     **Option to Purchase.** In addition to the right of first refusal set forth in the above section, Landlord grants to Tenant an option to purchase the Premises, which option shall commence at the expiration of the Initial Term and at the beginning of the one (1) year automatic renewal terms thereinafter, and terminate at the conclusion of this Lease. For purposes of clarity, the purchase option granted to Tenant shall remain in force during all renewal terms of the Lease. This option may be exercised at any time by Tenant upon giving Landlord a written notice in accordance with Section 22. Should Tenant exercise this purchase option, the parties will be deemed to have entered into the following agreement (the "Agreement") on the date of the notice:

14.1     **Price.** The purchase price of the Premises shall be an amount agreed upon by the parties, with any Tenant Improvements valued in as provided below. If the parties cannot agree, they shall choose a certified real estate appraiser and the two appraisers so chosen shall select a third, and the three shall conduct independent appraisals of the then current fair market value of the Premises using the sales comparison approach, with Tenant Improvements valued as provided below, the highest and lowest appraisal to be rejected and the purchase price to be the amount of the middle appraisal. Each party shall pay the fees of the appraiser it selects, and the two shall equally share the fees of the third.

Value of Improvements: Tenant may make certain improvements after the execution of this lease – with improvements being defined as substantial changes to the building; i.e. new roof, new HVAC, additions the Property, etc, but not just ordinary repairs/maintenance. Furthermore, if improvement is being made due to fault of Tenant or its occupants, then no value shall be assigned to that improvement; e.g. resident runs ~~Tenant~~ into outside compressor and requires it to be replaced. ~~Landlord~~ shall keep an ongoing ~~Landlord~~ record of any improvements to the Property and provide the same to ~~Tenant~~ each year. As provided above, ~~Landlord~~ shall also notify ~~Tenant~~ of any Improvements prior to being made so that ~~Tenant~~ can discuss classification at that time (improvement versus repair).

If the parties can agree upon a value for the Property, the value assigned the improvements shall also be part of that agreement, but with the general understanding and intent being that improvements will be valued based on a 10 years life, with straight line depreciation over that 10 year period.

If the Property is to be appraised, the appraisers will be given a list of the improvements as asked to factor in a with and without valuation, and such improvements shall be valued accordingly and the purchase price shall be the "without improvement valuation."

14.2     **Payment of Price.** The entire purchase price shall be paid in cash at closing unless the parties mutually agree upon other terms at that time.

-7-

**14.3.   Title Insurance.** Landlord shall furnish to Tenant a commitment for an owner's policy of title insurance in the amount of the purchase price from a title insurance company authorized to issue title insurance policies in the state in which the Premises are located. Delivery of a commitment for such a policy will be made to Tenant within twenty five days of the date the parties are deemed to have entered into this Agreement, the insurance policy itself to be issued at Landlord's expense following the recording of the deed. Tenant shall have ten (10) days after delivery of the commitment to examine it and to advise Landlord in writing of any exceptions which are reasonably objectionable to Tenant. In the absence of such a notice, title will conclusively be presumed to be satisfactory to Tenant. Landlord shall have until the closing date to correct any objections to title and have them shown on a revised title Insurance commitment. If Landlord is receiving a mortgage or deed of trust at closing, Tenant shall provide at its expense a loan policy of title insurance.

**14.4.   Casualty Damage.** If prior to the closing date the buildings and improvements situated on the Premises are destroyed or substantially damaged by fire, lightning or other cause that could be covered by extended coverage insurance, Tenant shall purchase the Premises under this Agreement, but shall be entitled to receive at closing either (a) all the insurance proceeds, or (b) an assignment of Landlord's right to receive the insurance proceeds.

**14.5.   Closing.** The closing of this transaction shall take place two months after the date of this Agreement, at 10:00 A.M. in the office of the title insurance company issuing the title insurance commitment, or at such other place or time as the parties may agree. At closing, Landlord shall deliver to Tenant an executed deed conveying the Premises to Tenant, and Tenant shall deliver to Landlord the cash, notes, mortgage, deed of trust, or other documents evidencing its satisfaction of the purchase price. Tenant shall pay all closing costs except for the owner's title insurance policy premium.

**15.   Inspection.** Landlord and its agents may enter the Premises at reasonable hours to examine the same and do anything required of Landlord by this Lease. During the last 120 days of the Lease term, Landlord may display a "For Rent" sign on the Premises, and show the Premises to prospective tenants.

**16.   Tenant's Personalty.** Landlord shall not be liable for any loss or damage to any of Tenant's merchandise, personalty or other Premises on or about the Premises regardless of the cause of the loss or damage. Tenant shall be responsible for any taxes or assessments made against such Premises, and shall defend and indemnify Landlord against the same.

**17.   Eminent Domain.** If any part of the Building is taken under the power of eminent domain, conveyed in lieu of condemnation, or acquired for any public or quasi-public use, this Lease may be terminated by Landlord, at its sole option. Landlord shall be entitled to all award or compensation without apportionment. Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease.

**18.   Damage By Casualty.**

- 8 -

24833512v1

18.1.   **Total Untenantability.** If a substantial part of the Premises is so damaged by fire or other casualty that the Premises are totally untenantable, Landlord may at its sole option terminate this Lease. If the Lease is so canceled, rent shall be paid only to the date of cancellation and Tenant shall immediately surrender Premises to Landlord. If Landlord does not elect to terminate this Lease, in case of total untenantability, this Lease shall continue in full force and effect and Landlord shall restore the Premises to at least their previous condition, within a reasonable time. For that purpose, Landlord and its agents and contractors may enter the Premises. Rent shall abate during the period of untenantability. Landlord shall be entitled to all insurance proceeds, including any proceeds from Tenant's insurance policies to the extent the same cover Building fixtures, equipment, systems and materials that need to be replaced as part of the repair of the Building.

18.2.   **Partial Untenantability.** If the Premises are so damaged by fire or other casualty that tenantability is only partially disturbed, this Lease shall not terminate and Landlord shall restore the Premises to at least their previous condition within a reasonable time. For that purpose, Landlord and its agents may enter the Premises, and rent shall abate in proportion and duration equal to the partial untenantability of the Premises. For this purpose, Landlord shall determine the proportion and duration of the partial untenantability, and its determination shall be binding upon both parties. No claims shall be made by or allowed to Tenant by reason of any inconvenience or annoyance arising from the repair work. Landlord shall be entitled to all insurance proceeds, including any proceeds from Tenant's insurance policies to the extent the same cover Building fixtures, equipment, systems and materials that need to be replaced as part of the repair of the Premises.

18.3.   **Removal of Rubbish and Property.** In the event the Premises suffer any casualty damage, Tenant shall within ten days remove any debris or rubbish, remove its personal Premises from the damaged Premises, and clean the damaged Premises to facilitate repair or restoring operations.

19.   **Default By Landlord.** Tenant shall give Landlord written notice of any default by Landlord. If (a) the default is not cured within thirty (30) days after Landlord receives the written notice, or (b) Landlord does not within that thirty (30)-day time period take actions which, if continued with reasonable diligence, will cure the default, then Tenant at its election may declare this Lease terminated after an additional period of thirty days. If this Lease is rightfully terminated in accordance with this section, rent shall be paid only to the end of the second thirty (30)-day period. Tenant shall look solely to Landlord's equity in the Premises for satisfaction of any remedies of Tenant in the event of Landlord's breach.

20.   **Default By Tenant.**

20.1.   **Events of Default.** Tenant will be in default under this Lease upon the happening of any one or more of the following events:

- 9 -

24833512v1

(a)     Failure of Tenant to timely make any rent payment within ten (10) days after notification by Landlord or to fully perform any obligation contained in this Lease.

(b)     Any warranty, representation or statement made or furnished to Landlord by or on behalf of Tenant for the purpose of inducing the execution of this Lease, or any other agreement between the parties proves to have been false in any material respect when made or furnished.

(c)     Tenant is dissolved or its existence terminated; Tenant becomes insolvent, its business fails, or a receiver is appointed for any of Tenant's Premises; Tenant is generally not paying its debts as they become due; or Tenant makes an assignment for the benefit of its creditors or is the subject of any voluntary or involuntary bankruptcy or insolvency proceeding.

(d)     Any of the occurrences set forth in this section above occurs with respect to any guarantor or surety of Tenant's obligations.

(e)     Tenant abandons the Premises, or the Premises or Tenant's leasehold interest in the Premises are attached or taken under any court order or writ of execution.

20.2.     **Rights of Landlord.** If Tenant defaults, Landlord may re-enter the Premises and take possession of the Premises, with or without force or legal process, and without notice or demand. The service of notice, demand and legal process are waived by Tenant. Upon its entry, Landlord may prevent Tenant's entry upon the Premises, without being liable to Tenant for any damages or for prosecution. Without limitation, Landlord may enforce its rights by an action for rent and possession, unlawful detainer, or other legal remedy. Tenant agrees that, notwithstanding Landlord's re-entry and possession of the Premises, Tenant shall remain liable for and shall pay Landlord an amount equal to the entire rent payable to the end of the then-applicable term of this Lease. This amount may either (i) be accelerated and become payable at once, or (ii) become due and be payable monthly, at the sole option of Landlord. In addition, Tenant shall be liable for and shall pay to Landlord any loss or deficiency sustained by Landlord because of Tenant's default.

20.3.     **Reletting Premises.** Notwithstanding Landlord's re-entry and possession of the Premises, Landlord upon Tenant's default shall have the right, without notice to Tenant, and without terminating this Lease, to make alterations and repairs for the purpose of reletting the Premises. Landlord may relet or attempt to relet the Premises or any part of the Premises for the remainder of the then-applicable Lease term or for any longer or shorter period as opportunity may offer, to such persons and at such rent as may be obtained. Nothing in this Lease shall require Landlord to relet or make any attempt to relet the Premises, and any reletting shall be done by Landlord as agent for Tenant. In case the Premises are relet, Tenant shall pay the difference between the amount of rent

- 10 -

payable during the remainder of the term and the net rent actually received by Landlord during the term after deducting all expenses for repairs, alterations, recovering possession and reletting the same, which difference shall either (i) accrue and be payable monthly, or (ii) be accelerated and become payable at once, at Landlord's sole option.

      **20.4.   No Termination.** No actions taken by Landlord after Tenant's default shall be construed as indicating a termination of this Lease. This Lease shall remain in full force and effect and shall not be terminated unless Landlord so elects in writing.

      **20.5.   Cure.** At Landlord's election, Landlord may cure any default of Tenant by expending money, contracting for the making of repairs, purchasing insurance, or by any other actions. If Landlord takes any such actions, Tenant will immediately upon demand reimburse Landlord for all of Landlord's expenses. All such expenses shall bear interest from the dates they are incurred until the dates they are paid, at an annual rate equal to the rate set forth in Section 3.2 above.

      **20.6.   Costs and Expenses.** Landlord shall be entitled to recover from Tenant all of Landlord's expenses in exercising any of its rights under this Lease, including without limitation Landlord's attorney's fees and expenses.

      **20.7.   Remedies Cumulative.** All of Landlord' remedies are cumulative, and may be exercised successively or concurrently, at Landlord's election.

      **20.8.   No Counterclaims.** Tenant agrees not to make any counterclaim of any nature in any proceedings brought in connection with this Lease. This agreement shall not, however, prohibit the maintenance of any claim in a separate action. Tenant waives any rights it may have to redeem the Premises from any re-entry and possession by Landlord. Any breaches of any covenants of this Lease shall be material breaches entitling Landlord to its remedies, regardless of the extent of actual damage.

      **21.   Waivers.** Any waiver, consent or approval on the part of Landlord must be in writing, and shall be effective only to the extent specifically set forth in the writing. No delay or omission by Landlord in the exercise of any right or remedy with respect to any one occasion shall impair Landlord's ability to exercise the right or remedy in the same or on another occasion.

      **22.   Notices.** All notices or other communications shall be in writing signed by the sender, and shall either be (a) personally delivered or (b) mailed by certified mail, at or to the following addresses:

Landlord:    New Lifestyles, Inc.
             c/o Kenneth L. Cuave, President
             P. O. Box 64
             Winchester, VA  22604
             (540) 722-4521
             drkuave@newlifestyle.net

24833512v1

| Copy To: | William A. Truban, Jr. |
| --- | --- |
| | Owen and Truban, PLC |
| | P. O. Box 267 |
| | Winchester, VA 22604 |
| | (540) 678-0995 |
| | btruban@owentruban.com |
| | |
| Tenant: | CALO Young Adult - Winchester, LLC |
| | P.O. Box 1810 |
| | Lake Ozark, Missouri 65049 |

Either party may change the address by written notice to the other. Notices shall be effective when received (if personally delivered) or when deposited in the United States Mail (if mailed by certified mail), or if sent via email, upon receipt of a reply email confirming such notice has been received.

23. **Return of Premises.**

23.1. **Condition of Premises.** At the termination of this Lease, Tenant agrees to deliver to Landlord the Premises and all mechanical systems and all equipment and fixtures thereon in good working order and condition.

23.2. **Holdover Tenancy.** Should Tenant fail to vacate the Premises at the termination of this Lease, Tenant shall pay for each day of the holdover period either (a) twice the then-applicable rent, or (b) a current fair market rent for the Premises (as determined by Landlord in its sole judgment), whichever is higher. All the terms and provisions of this Lease shall continue to apply. Tenant will be a tenant at will during the holdover period. Nothing in this section shall be a waiver of or preclude the exercise of Landlord's remedies for Tenant's default. Should Tenant's holdover prevent Landlord from fulfilling the terms of another Lease, Tenant shall defend and indemnify Landlord from all direct and consequential damages for which Landlord may be liable, or which Landlord may suffer, as a result thereof.

24. **Quiet Enjoyment.** Neither Landlord nor Landlord's successors or assigns will disturb Tenant in its quiet enjoyment of the Premises.

25. **Indemnity.** Tenant shall indemnify, defend, and hold harmless Landlord from and against any and all damage, expense, claim, liability or loss including reasonable attorneys' fees arising out of or in any way connected to any condition occurring on the Premises or arising out of any use of the Premises during the term of this Lease. This duty to indemnify and defend shall include but shall not be limited to damages, costs, liability, loss and expense including professional consultant, engineering or attorneys' fees incurred in responding to federal, state, or local laws, strict liability, or common law. Tenant shall ensure that its liability insurance policy covers its obligations under this indemnity agreement.

- 12 -

26.   Waiver of Subrogation. Landlord and Tenant each respectively waive all rights of recovery against the other and the other's agents, employees, permitted licenses and assignees, for any loss or damage to Premises or injury to or death of persons, to the extent the same is covered or indemnified by proceeds of any insurance policy which either of the parties hereunder is required to carry under the terms of this Lease (whether or not such party is actually maintaining such insurance coverage), or for which reimbursement is otherwise received. This agreement, however, shall apply only so long as the parties' respective insurance companies expressly concur in this agreement and waive all subrogation rights. Each party shall have a continuing obligation to notify the other party if these waivers are not granted. Nothing in this section shall impose any greater liability upon the Landlord than would have existed in the absence of this section. The parties specifically recognize and acknowledge that the waivers contained herein are and shall be effective even though such claims may arise as a result of the negligence of the party being released hereunder, or such party's agents, officers or employees.

27.   Attornment. Tenant agrees to and does attorn to any successor to Landlord's interest in all or any part of the Premises, including without limitation any purchaser at any foreclosure sale of all or any part of the Premises.

28.   Owner. Owner joins in this lease and agrees that so long as Landlord is renting the above Property to Tenant, Owner will lease the same to Landlord. Furthermore, if Tenant exercises any rights under Sections 13 (Right of First Refusal) and 14 (Option), above, Owner agrees to be bound by the terms and conditions of this lease so as to convey such Property under such terms (just as if Owner were the Landlord hereunder). Owner warrants and represents it is owned 100% by Kenneth Cuave.

29.   Successors and Assigns. This Lease shall inure to the benefit of and be binding upon the heirs, estates, executors, administrators, receivers, custodians, successors and (in the case of Tenant, permitted) assigns of the respective parties.

29.   Memorandum of Lease. Neither this Lease nor any memorandum or other evidence thereof shall be filed of public record by either party.

- 13 -

INTENDING to be fully bound, the parties have executed this Lease the day and year above written.

**Landlord:**          **NEW LIFESTYLES, INC.**

a Virginia corporation

By: _____

Kenneth Cuave, President

**Tenant:**          **CALO YOUNG ADULTS - WINCHESTER, LLC**

a Delaware limited liability company

By: _____

Print Name: _____

Print Title: _____

**Owner:**          **PROPERTIES OF WINCHESTER, LLC**

By: _____

Kenneth Cuave, Member

- 14 -

24833512v1

**Exhibit A**

**Tax Map Info and Deed For Property**

- 15 -

## Renfo Property Information Form

Exhibit A

### Property Information

| | | | | | | |
|---|---|---|---|---|---|---|
| Area | WINC | Dist | | Rec # | 6,478.01 | Map Id 172-01-D- 2 |
| Description | 303 AMHERST STREET | | | | | |
| Address | 303 AMHERST ST | | | | Acres | 0.06 |
| Land Value | 75,000 | | Zoning | MR | Elec / Gas | Y / Y |
| Bldg Value | 212,700 | | Esmt / ROW | PAVE / PUBL | Water / Sewer | PUBL / PUBL |
| Total Value | 287,700 | | Character | RLNG | Deed Ref Bk / Pg | 080002614 |
| LU Value | | | Land Use | SFAM | Sale Price / Parcels | 1/4 |
| Tax Amount | 2,818.07 | | Occupancy | SFAM | Sale Date | 9/25/2008 |

### Owner Information

| | |
|---|---|
| Name | PROPERTIES OF WINCHESTER LLC |
| Address | P O BOX 64 |
| | WINCHESTER, VA 22604 |

### Building Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Bldg Sq Ft | 1,979 | Stories | 2 | Units | 1 | Year Built | 1925 |
| Bsmt Sq Ft | 728 | Air Cond | N | Garage / # | | Condition | AVG |
| Bsmt Fin SF | 300 | Fireplace | 1 | Carport / # | | Rooms | 9 |
| Basement | FULL | Flue | | Heat | HWTR | Bedrooms | 4 |
| Foundation | CONC | Roof Type | GABL | Fuel | GAS | Fullbaths | 2 |
| Walls Ex / In | STUC / PLST | Roof Matl | SHGL | Floor | WOOD | Halfbaths | 1 |

The information contained herein is deemed reliable but NOT GUARANTEED. The official city or
county records must be checked to verify the accuracy of this information.

080002614

Consideration: Exempt Code: 58.1-811 (10)
Grantee Address: P.O. Box 64
Winchester, VA 22604

THIS DEED, made and dated this 24 day of September, 2008, by and between KENNETH L. CUAVE (also known of record as KENNETH CUAVE), hereinafter called the Grantor; and PROPERTIES OF WINCHESTER, LLC, a Virginia limited liability company, hereinafter called the Grantee.

WITNESSETH: That for and in consideration of the sum of Ten Dollars, and other valuable consideration, the receipt of which is hereby acknowledged, the Grantor does hereby grant and convey with General Warranty and English Covenants of title unto the Grantee, in fee simple, the following property:

PARCEL ONE: All that certain lot or parcel of land, together with the improvements thereon and the appurtenances thereto belonging, improved by a dwelling designated as 221 West Boscawen Street in the City of Winchester, Virginia, fronting on Boscawen Street a distance of 26 feet, more or less, and extending back southwardly 124 feet, more or less; AND BEING the same property conveyed to Kenneth Cuave by deed dated August 28, 2006, from Cuave Family Properties, LLC, a Virginia limited liability company, of record in the Clerk's Office of the Circuit Court of City of Winchester, Virginia as Instrument No. 060003650, (TAX MAP NO. 192-01-N-6)

PARCEL TWO: All of that certain lot or parcel of land, containing 2,728.80 square feet, more or less, improved by a dwelling house designated 303 Amherst Street, located in the northwest section of City of Winchester, Virginia, and more particularly described as Lot 1 on that certain plat of "Speakman Lots, North Stewart and Amherst Streets" recorded

303

GREGORY F. HUTCHINSON ATTORNEY AT LAW 104 S. BRADDOCK ST. WINCHESTER, VA 22601

In the Office of the Clerk of the Circuit Court for the City of
Winchester, Virginia, in Deed Book 140, at Page 540; and
further and more particularly described by plat and survey of
Dove & Associates, dated October 10, 1991 recorded in the
aforesaid Clerk's Office in Deed Book 249, Page 1404; AND
BEING the same property conveyed to Kenneth L. Cuave by
deed dated November 18, 2005, from Jack S. Carothers and
Patsy C. Carothers, husband and wife, of record in the
aforesaid Clerk's Office as Instrument No. 050005838.
**(TAX MAP NO. 172-01-D-2)**

**PARCEL THREE:** All of that certain land at 309 Amherst
Street in the City of Winchester, Virginia, fronting 40 feet on
Amherst Street, more or less, extending a uniform width
southerly for 180 feet, more or less, to a joint alley in the rear;
bounded on the east by land now or formerly of Buckner, on
the west by land now or formerly of Clevenger; AND BEING
the same property conveyed to Kenneth Cuave by deed dated
September 20, 2006, from Bradford J. Felix and Caroline R.
Felix, husband and wife, of record in the Clerk's Office of the
Circuit Court of the City of Winchester, Virginia, as Instrument
No. 060004008. **(TAX MAP NO. 271-01-D-5)**

**PARCEL FOUR:** All that certain lot or parcel of land,
together with all improvements and appurtenances thereto
belonging, lying and being situate at Number 411 on the
Western Side of South Cameron Street, in the City of
Winchester, Virginia, fronting on said street a distance of 50
feet, more or less, and extending back Westward a distance of
110 feet, more or less; AND BEING the same property
conveyed to Kenneth L. Cuave by deed dated December 16,
2002, from Laurance O. Sullivan, Jr. and Linda S. Sullivan, his
wife, of record in the Clerk's Office of the Circuit Court of the
City of Winchester, Virginia, as Instrument No. 020004849.
**(TAX MAP NO. 192-1-J-10)**

Reference is hereby made to the aforesaid instruments and the

attachments and the references therein contained, for a more particular

description of the property hereby conveyed.

This conveyance is made subject to all easements, rights of way and restrictions of record, if any, affecting the subject property.

WITNESS the following signature and seal:

_____ (SEAL)
KENNETH L. CUAVE

STATE OF VIRGINIA,
CITY OF WINCHESTER, to-wit:

The foregoing instrument was acknowledged before me in my City and State this 24 day of September, 2008, by KENNETH L. CUAVE.

My Commission Expires: May 31, 2009

_____
NOTARY PUBLIC

MARY PAULA WILSON
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7151824

INSTRUMENT #080002614
RECORDED IN THE CLERK'S OFFICE OF
WINCHESTER ON
SEPTEMBER 25, 2008 AT 11:54AM

TERRY H. WHITTLE, CLERK
RECORDED BY: MRS

## STANDARD COMMERCIAL LEASE

**THIS LEASE** ("Lease") is made this 20th day of November, 2015, by and between NEW LIFESTYLE, INC., a Virginia corporation (hereinafter "Landlord") and CALO YOUNG ADULTS – WINCHESTER, LLC, a Delaware limited liability company (hereinafter "Tenant"), and PROPERTIES OF WINCHESTER, LLC ("Owner").

1. **Leased Premises.** Landlord leases to Tenant, and Tenant leases from Landlord, the following described premises and all the improvements situated on the premises (hereinafter, in whole or in part, the "Premises"), in the City of Winchester, Virginia:

| Property | Tax Map Number | Permitted Use | Monthly Rent |
|---|---|---|---|
| 304 Amherst Street | 172-01-B-4 | Residential | $ 2,750 |

See Exhibit A for additional description of the Premises – with Exhibit "A" attached hereto and incorporated herein by this reference, with such property hereinafter referred to as the "Premises" and the improvements hereinafter referred to as the "Building."

The Premises include furniture and equipment and that is being included in the lease hereunder. Such furniture and equipment shall remain the property of the Landlord. Tenant shall maintain such furniture and equipment in good condition and replace the same if broken. If Tenant no longer desires any such furniture and equipment to remain in the Premises, Tenant shall notify Landlord of the same and Landlord shall have 10 business days to remove the same.

2. **Use.** The Premises shall be used only for a young adult transitional program and associated uses related thereto – with the permitted use the Premises set forth in Section 1 above. The Premises shall not be used for any other purpose without Landlord's prior written consent. Tenant shall not commit or allow any waste, nuisance, or other such act or omission to occur on the Premises, and shall not do any act or allow on the Premises any condition which may disturb the quiet enjoyment of other tenants of the Building or those occupying surrounding properties. Tenant shall comply with all laws in its usage of such properties and if changes are required to such properties due to such use, Tenant shall be responsible for the same.



- 1 -



EXHIBIT

1B

3.   **Base Rent.**

3.1.   **Base Rent Amount.** Tenant agrees to pay as Monthly Base Rent for each property in the amounts set forth above, payable in advance on the fifth day of each calendar month during the term of this Lease.

3.2.   **Late Payments.** Any rent payments received by Landlord more than five (5) days late shall bear a late payment fee of $100 per property rent that is late, and interest from the dates they are due until the dates they are paid, at an annual rate equal to two percentage points over the prime rate as announced from time to time in *The Wall Street Journal*, recomputed and modified on the first day of each and every calendar month. In the event the above publication is no longer published, then Landlord shall choose another generally accepted and widely published prime rate.

3.3.   **Annual Increases.** The amount of the Base Rent shall be increased once each third lease year, as of the first day of the first month of the Lease year, by three percent (3%) over the amount thereof for the preceding three lease years, including renewal terms. The new Base Rent amount shall be payable beginning with the first month of the lease year, without the requirement of any notice from Landlord to Tenant.

4.   **Term.**

4.1.   **Initial Lease Term.** This Lease shall be for an initial term of three years and 41 days, commencing November 20, 2015, and ending at midnight on December 31, 2018.

4.2.   **Automatic Renewal.** If this Lease is in force on the expiration date of the initial term, and if the Tenant on that date has fully performed all its obligations under this Lease, this Lease shall automatically renew for one year terms thereinafter. This automatic renewal option shall continue from year to year until terminated by written notice from Tenant to Landlord no later than thirty (30) days prior to the expiration of the then-current term. The same terms which apply during the initial term shall apply during the extension.

5.   **Condition of Premises.** Tenant has inspected and knows the condition of the Premises, and accepts the same in their present condition. By its execution of this Lease, Tenant acknowledges that Landlord has made no warranties, representations or statements whatsoever concerning any condition or matter relating to the Premises, including such matters as the income or expenses of the Premises, title to the Premises, legal status of the Premises, availability or cost of utilities, or physical condition of the Premises or any improvements thereon. Tenant further acknowledges that no agents, employees, brokers or other persons are authorized to make any representations or warranties for Landlord. Landlord has relied upon these acknowledgments as a material inducement to enter into this Lease. Tenant is hereby leasing the Premises "as is" and "where is" and agrees that it relies upon no warranties, representations or statements by Landlord or any other persons for Landlord in entering into this Lease. Tenant

- 2 -

acknowledges that there is in and about the Premises nothing dangerous to life, limb, health or property; and Tenant hereby knowingly and deliberately waives any claim for damages which it may have against Landlord that may arise from any defects in or about the Premises after the execution hereof.

6.   **Utilities.** Tenant shall be responsible for any and all utility and service costs of the Premises, including, without limitation, all charges for gas, water, electricity, sanitary sewer, telephone, cable television, internet access, trash removal and any other utilities or similar services used at or in connection with the Premises.

7.   **Tenant's Taxes.** Tenant shall timely pay or cause to be paid when due all real estate, personal property, sales, use and other taxes or assessments, general or special, now or hereafter imposed by any federal, state, or local government on the Tenant's property located in or used in connection with the Premises or on the ownership, lease, sale, possession or use of the Premises, whether the same are assessed against Landlord or Tenant. If any such tax is assessed against Landlord, Landlord shall provide Tenant with written notice of the assessment. Upon demand Tenant shall provide Landlord with proof of all required payments.

8.   **Insurance.**

8.1.   **Fire and Extended Coverage.** Landlord shall obtain "all risk" (sometimes called "open perils" or "special perils") fire and extended coverage insurance on the Building, including fixtures and non-removable tenant improvements, in such amount as Landlord deems sufficient. Tenant shall cooperate with Landlord so that the lowest insurance rating can be obtained, given the use and condition of the Premises. Accordingly, Tenant shall fully cooperate with the insurance carrier in implementing any measures or complying with any requirements the carrier may have. All costs of such measures or compliance shall be borne by Tenant. If the insurance rates published by the Insurance Service Office of the State of are increased as the result of any activities or hazards introduced by Tenant, then Tenant shall pay the incremental cost thereof promptly upon demand.

8.2.   **Liability.** At its sole cost and expense, Tenant shall purchase and maintain commercial general liability insurance on the Premises, including a property damage provision, insuring against liability for injury to persons or property occurring on or about the Premises or arising out of the ownership, maintenance, use or occupancy of the Premises. The insurance shall be in an amount not less than One Million Dollars ($1,000,000) combined single limit per occurrence, and a general policy aggregate of not less than Two Million Dollars ($2,000,000) if such aggregate applies to this policy.

8.3.   **Policy Requirements.** All policies of insurance obtained now or at any future time by Tenant, shall name Landlord, as well as Tenant, as an insured, by means of a separation of insureds clause, sometimes also called a "severability of insureds" or "cross liability" clause. The policies shall also provide that Landlord be given at least thirty (30) days' notice before any cancellation or material modification of the policy.

- 3 -

24849708v1

**8.4. Certificates of Insurance.** Tenant shall furnish to Landlord certificates of insurance evidencing the insurance coverage required by these provisions, and providing that Landlord shall receive thirty (30) days' notice of cancellation or material change in coverage. Within thirty (30) days after each premium payment date Tenant shall furnish Landlord with a copy of the premium bill and evidence of payment.

**8.5. Casualty Damage; Claims.** In the event of casualty damage to the Premises, and if Landlord is carrying the all-risk property insurance, Tenant shall immediately report the damage to Landlord and Landlord shall make whatever claim against the insurance company that Landlord deems advisable. Tenant shall cooperate in connection with the claim and shall be bound by Landlord's actions. In the event of either damage to the Premises by casualty or an assertion of liability, and if Tenant is carrying the applicable insurance policy, Tenant shall immediately report the same to the applicable insurance company and make a claim for insurance proceeds, delivering to Landlord a copy of the claim. Landlord may take such action as it deems necessary regarding the claim, and Tenant shall reimburse Landlord for all of Landlord's costs in connection with Landlord's action, including without limitation any attorney's fees expended by Landlord. Any insurance proceeds shall be paid to Landlord and may be disbursed as Landlord in its sole discretion deems appropriate.

**9. Liens and Encumbrances.**

**9.1. Subordination.** This Lease shall be and hereby is made subject and subordinate to any present or future mortgages, deeds of trust, and other liens or encumbrances executed or consented to by Landlord which do not materially affect Tenant's use of the Premises. The holder of any such lien or encumbrance may notify Tenant in writing of its interest, and in such event Tenant shall send copies of all notices or communications regarding this Lease to the holder of the lien or encumbrance. Such holder shall be entitled to take any action or exercise any rights reserved to Landlord under this Lease.

**9.2. No Further Encumbrance.** Tenant shall not encumber or permit the encumbrance of Premises or this leasehold estate by any mortgage, deed of trust, assignment, collateral assignment, security interest, lien or other charge. If any encumbrance to which Landlord has not consented is created or filed of record against the Premises or this leasehold estate, Tenant shall discharge or cause the discharge of the same within ten days after its creation. Tenant shall defend and indemnify Landlord from all liability, damages and expenses incurred by Landlord which result from any such encumbrance.

**9.3. No Mechanic's Liens.** This Lease does not require Tenant to improve the Premises or construct any improvements or additions on the Premises. Any improvements or additions to the Premises which Tenant might make or permit are for the sole use of Tenant and will not benefit Landlord's reversion. Tenant is not, and shall not be deemed to be, the agent of Landlord in contracting or arranging for any improvement of the Premises or any construction on the Premises.

- 4 -

24849703v1

9.4.   Indemnification.   Tenant shall promptly pay all bills for labor done or material or equipment supplied for any construction or repair work done on the Premises. Failure to promptly pay any such bills shall be a default under this Lease. Tenant shall defend and indemnify Landlord from all liability, damages or expense resulting from any mechanic's lien claims affecting the Premises.

10.   **Maintenance and Repair.**   Tenant shall have the obligation of maintaining the roof, downspouts, exterior walls and foundation of that portion of the Building constituting the Premises, and shall also repair and maintain the general building plumbing, heating, electrical, air conditioning and ventilation systems and equipment which serve the Premises, including any such systems or equipment located outside the Premises but which exclusively serve the Premises.   Tenant shall also maintain in good order and repair all improvements, alterations and additions which Tenant may make to the Premises, including any alterations to the Building which were made in the installation thereof, including roof and wall penetrations.   In addition and without limitation, Tenant shall protect water pipes, heating and air conditioning equipment, plumbing, fixtures, appliances, and sprinkler systems serving the Premises from becoming frozen or damaged by other than ordinary wear and tear. Tenant shall be responsible for all window glass replacement and for maintenance of light fixtures and lamps throughout the Premises. Tenant shall be responsible for all cleaning and janitorial services within the Premises, and Landlord shall have no responsibility therefor. Tenant shall keep the parking lot adjacent to the Premises and all sidewalks, alleys, walkways and asphalted or concrete areas of the Land which serve the Premises clean, sightly, and free of snow and rubbish, and shall keep and maintain the same in good condition, repairing cracks and potholes and replacing the asphalt or concrete when needed.

Landlord shall have no responsibility for any repairs/improvements unless such damage is caused by Landlord.

11.   **Tenant Improvements and Alterations.**

11.1.   **Tenant's Rights.**   At its sole expense, Tenant may, but is not required to, make improvements, alterations or additions to the Premises, subject to Landlord's prior approval, which shall not be unreasonably withheld.   Any improvements, alterations or additions shall be of good workmanship and material and shall not reduce the size or strength of the then existing improvements or of any load bearing wall or structural support.   Landlord makes no representation or warranty concerning whether any such work is permitted by the applicable laws, ordinances, rules and regulations of any applicable governmental authority.   Tenant agrees to obtain all necessary consents, licenses, approvals, and authorizations of any such governmental authorities or utility providers prior to undertaking any such work.

11.2.   **Payment of Costs; Indemnity.**   Tenant shall promptly pay all bills and expenses resulting from any such improvements, alterations or additions.   Tenant shall defend and indemnify Landlord and its managers and agents from and against any and all claims, losses, costs, expenses, and liabilities arising as a result of or in connection with any work done on or related to the Premises, including any claims for

- 5 -

24849708v1

damage or injury, and any mechanic's lien claims. Tenant shall fully pay and satisfy any mechanic's liens which may be filed against the Building or any portion of the Land as a result of any of Tenant's work.

11.3. **Ownership of Improvements; Removal.** Any improvements, alterations, additions or fixtures placed on the Premises, whether or not permanently affixed to the Premises, shall become a part of the realty, shall belong to Landlord, and shall remain on and be surrendered with the Premises at the termination of this Lease. No improvements, alterations or additions to the Premises shall be removed without Landlord's prior written consent, although upon Landlord's request Tenant shall remove, at the termination of this Lease, any such improvements, alterations and additions which Landlord may specify. Tenant shall repair all damage caused by any removal, including any damage caused by wall or roof penetrations.

12. **Assignment or Sublease.**

12.1. Tenant shall not assign this Lease, sublease the Premises or any part thereof, or allow anyone else to use or occupy any part of the Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed. The parties agree that, in determining whether to grant consent, Landlord may take into consideration the net worth or other creditworthiness of the proposed assignee or subtenant, the nature of such party's proposed use of the Premises or portion thereof, such party's general business reputation and character, the impact which the proposed assignment or sublease would have upon other tenants of the Building or the future value of the Building, and other such factors. Notwithstanding the above, Tenant shall not be required to obtain Landlord's consent in the event that Tenant is sold to a third party or Tenant forms a new entity, which is controlled by Tenant or its affiliates. However, no assignment/sublease shall in any way relieve Tenant of its obligations under this lease.

12.2. **Assignment by Landlord.** Landlord may assign this Lease to any subsequent purchaser of the Building or any other entity owned by Kenneth Cuave, and upon such assignment Landlord shall be released from all rights and obligations under the Lease, except for any such rights or obligations accruing and unperformed prior to the date of the sale.

13. **Right of First Refusal of Tenant to Purchase Building or Lease Additional Space.** If at any time during the life of this Lease, including any renewal terms, Landlord receives an offer from a third person for the purchase of the Building or for the leasing of any portion of the Building (other than the Premises) to a party which is not a current tenant of the Building or a party related to a current tenant of the Building, and if Landlord desires to accept the offer, then Landlord shall promptly deliver to Tenant a copy of the offer (if written) or a letter setting forth the terms of the offer (if verbal), and Tenant may within fifteen (15) days thereafter elect to purchase or lease the Building or portion thereof on the same terms as those set forth in the offer. Should Tenant not exercise its right to purchase or lease the Building or portion thereof, and if Landlord does not sell or lease the Building or portion thereof to the third party, then Tenant shall continue to have this right of first refusal in connection with subsequent

- 6 -

offers. If Landlord sells or leases the Building or portion thereof after Tenant's election not to exercise this right, then the sale (if the transaction is a sale) shall be subject to this Lease. If Landlord leases only a portion of the Building, then this right of first refusal shall continue to exist with respect to the remaining portions of the Building.

14.     **Option to Purchase.** In addition to the right of first refusal set forth in the above section, Landlord grants to Tenant an option to purchase the Premises, which option shall commence at the expiration of the Initial Term and at the beginning of the one (1) year automatic renewal terms thereinafter, and terminate at the conclusion of this Lease. For purposes of clarity, the purchase option granted to Tenant shall remain in force during all renewal terms of the Lease. This option may be exercised at any time by Tenant upon giving Landlord a written notice in accordance with Section 22. Should Tenant exercise this purchase option, the parties will be deemed to have entered into the following agreement (the "Agreement") on the date of the notice:

14.1.   **Price.** The purchase price of the Premises shall be an amount agreed upon by the parties, with any Tenant Improvements valued in as provided below. If the parties cannot agree, they shall choose a certified real estate appraiser and the two appraisers so chosen shall select a third, and the three shall conduct independent appraisals of the then current fair market value of the Premises using the sales comparison approach, with Tenant Improvements valued as provided below, the highest and lowest appraisal to be rejected and the purchase price to be the amount of the middle appraisal. Each party shall pay the fees of the appraiser it selects, and the two shall equally share the fees of the third.

Value of Improvements: Tenant may make certain improvements after the execution of this lease – with improvements being defined as substantial changes to the building, i.e. new roof, new HVAC, additions the Property, etc. but not just ordinary repairs/maintenance. Furthermore, if improvement is being made due to fault of Tenant or its occupants, then no value shall be assigned to that improvement, e.g. resident runs into outside compressor and requires it to be replaced. Landlord shall keep an ongoing record of any improvements to the Property and provide the same to Tenant each year. As provided above, Landlord shall also notify Tenant of any improvements prior to being made so that Tenant can discuss classification at that time (improvement versus repair).

If the parties can agree upon a value for the Property, the value assigned the improvements shall also be part of that agreement, but with the general understanding and intent being that improvements will be valued based on a 10 years life, with straight line depreciation over that 10 year period.

If the Property is to be appraised, the appraisers will be given a list of the improvements as asked to factor in a with and without valuation, and such improvements shall be valued accordingly and the purchase price shall be the "without improvement valuation."

14.2   **Payment of Price.** The entire purchase price shall be paid in cash at closing unless the parties mutually agree upon other terms at that time.

- 7 -

24849708v1

14.3.   **Title Insurance.** Landlord shall furnish to Tenant a commitment for an owner's policy of title insurance in the amount of the purchase price from a title insurance company authorized to issue title insurance policies in the state in which the Premises are located. Delivery of a commitment for such a policy will be made to Tenant within twenty five days of the date the parties are deemed to have entered into this Agreement, the insurance policy itself to be issued at Landlord's expense following the recording of the deed, Tenant shall have ten (10) days after delivery of the commitment to examine it and to advise Landlord in writing of any exceptions which are reasonably objectionable to Tenant. In the absence of such a notice, title will conclusively be presumed to be satisfactory to Tenant. Landlord shall have until the closing date to correct any objections to title and have them shown on a revised title insurance commitment. If Landlord is receiving a mortgage or deed of trust at closing, Tenant shall provide at its expense a loan policy of title insurance.

14.4.   **Casualty Damage.** If prior to the closing date the buildings and improvements situated on the Premises are destroyed or substantially damaged by fire, lightning or other cause that could be covered by extended coverage insurance, Tenant shall purchase the Premises under this Agreement, but shall be entitled to receive at closing either (a) all the insurance proceeds, or (b) an assignment of Landlord's right to receive the insurance proceeds.

14.5.   **Closing.** The closing of this transaction shall take place two months after the date of this Agreement, at 10:00 A.M. in the office of the title insurance company issuing the title insurance commitment, or at such other place or time as the parties may agree. At closing, Landlord shall deliver to Tenant an executed deed conveying the Premises to Tenant, and Tenant shall deliver to Landlord the cash, notes, mortgage, deed of trust, or other documents evidencing its satisfaction of the purchase price. Tenant shall pay all closing costs except for the owner's title insurance policy premium.

15.   **Inspection.** Landlord and its agents may enter the Premises at reasonable hours to examine the same and do anything required of Landlord by this Lease. During the last 120 days of the Lease term, Landlord may display a "For Rent" sign on the Premises, and show the Premises to prospective tenants.

16.   **Tenant's Personalty.** Landlord shall not be liable for any loss or damage to any of Tenant's merchandise, personalty or other Premises on or about the Premises regardless of the cause of the loss or damage. Tenant shall be responsible for any taxes or assessments made against such Premises, and shall defend and indemnify Landlord against the same.

17.   **Eminent Domain.** If any part of the Building is taken under the power of eminent domain, conveyed in lieu of condemnation, or acquired for any public or quasi-public use, this Lease may be terminated by Landlord, at its sole option. Landlord shall be entitled to all award or compensation without apportionment. Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease.

18.   **Damage By Casualty.**

- 8 -

24849708v1

18.1.   **Total Untenantability.**  If a substantial part of the Premises is so damaged by fire or other casualty that the Premises are totally untenantable, Landlord may at its sole option terminate this Lease.  If the Lease is so canceled, rent shall be paid only to the date of cancellation and Tenant shall immediately surrender Premises to Landlord.   If Landlord does not elect to terminate this Lease in case of total untenantability, this Lease shall continue in full force and effect and Landlord shall restore the Premises to at least their previous condition, within a reasonable time.   For that purpose, Landlord and its agents and contractors may enter the Premises.  Rent shall abate during the period of untenantability.  Landlord shall be entitled to all insurance proceeds, including any proceeds from Tenant's insurance policies to the extent the same cover Building fixtures, equipment, systems and materials that need to be replaced as part of the repair of the Building.

18.2.   **Partial Untenantability.**  If the Premises are so damaged by fire or other casualty that tenantability is only partially disturbed, this Lease shall not terminate and Landlord shall restore the Premises to at least their previous condition within a reasonable time.   For that purpose, Landlord and its agents may enter the Premises, and rent shall abate in proportion and duration equal to the partial untenantability of the Premises.   For this purpose, Landlord shall determine the proportion and duration of the partial untenantability, and its determination shall be binding upon both parties.  No claims shall be made by or allowed to Tenant by reason of any inconvenience or annoyance arising from the repair work.  Landlord shall be entitled to all insurance proceeds, including any proceeds from Tenant's insurance policies to the extent the same cover Building fixtures, equipment, systems and materials that need to be replaced as part of the repair of the Premises.

18.3.   **Removal of Rubbish and Property.**  In the event the Premises suffer any casualty damage, Tenant shall within ten days remove any debris or rubbish, remove its personal Premises from the damaged Premises, and clean the damaged Premises to facilitate repair or restoring operations.

19.   **Default By Landlord.**  Tenant shall give Landlord written notice of any default by Landlord.  If (a) the default is not cured within thirty (30) days after Landlord receives the written notice, or (b) Landlord does not within that thirty (30)-day time period take actions which, if continued with reasonable diligence, will cure the default, then Tenant at its election may declare this Lease terminated after an additional period of thirty days.  If this Lease is rightfully terminated in accordance with this section, rent shall be paid only to the end of the second thirty (30)-day period.  Tenant shall look solely to Landlord's equity in the Premises for satisfaction of any remedies of Tenant in the event of Landlord's breach.

20.   **Default By Tenant.**

20.1.   **Events of Default.**  Tenant will be in default under this Lease upon the happening of any one or more of the following events:

- 9 -

(a) Failure of Tenant to timely make any rent payment within ten (10) days after notification by Landlord or to fully perform any obligation contained in this Lease.

(b) Any warranty, representation or statement made or furnished to Landlord by or on behalf of Tenant for the purpose of inducing the execution of this Lease, or any other agreement between the parties proves to have been false in any material respect when made or furnished.

(c) Tenant is dissolved or its existence terminated; Tenant becomes insolvent, its business fails, or a receiver is appointed for any of Tenant's Premises; Tenant is generally not paying its debts as they become due; or Tenant makes an assignment for the benefit of its creditors or is the subject of any voluntary or involuntary bankruptcy or insolvency proceeding.

(d) Any of the occurrences set forth in this section above occurs with respect to any guarantor or surety of Tenant's obligations.

(e) Tenant abandons the Premises, or the Premises or Tenant's leasehold interest in the Premises are attached or taken under any court order or writ of execution.

20.2. **Rights of Landlord.** If Tenant defaults, Landlord may re-enter the Premises and take possession of the Premises, with or without force or legal process, and without notice or demand. The service of notice, demand and legal process are waived by Tenant. Upon its entry, Landlord may prevent Tenant's entry upon the Premises, without being liable to Tenant for any damages or for prosecution. Without limitation, Landlord may enforce its rights by an action for rent and possession, unlawful detainer, or other legal remedy. Tenant agrees that, notwithstanding Landlord's re-entry and possession of the Premises, Tenant shall remain liable for and shall pay Landlord an amount equal to the entire rent payable to the end of the then-applicable term of this Lease. This amount may either (i) be accelerated and become payable at once, or (ii) become due and be payable monthly, at the sole option of Landlord. In addition, Tenant shall be liable for and shall pay to Landlord any loss or deficiency sustained by Landlord because of Tenant's default.

20.3. **Reletting Premises.** Notwithstanding Landlord's re-entry and possession of the Premises, Landlord upon Tenant's default shall have the right, without notice to Tenant, and without terminating this Lease, to make alterations and repairs for the purpose of reletting the Premises. Landlord may relet or attempt to relet the Premises or any part of the Premises for the remainder of the then-applicable Lease term or for any longer or shorter period as opportunity may offer, to such persons and at such rent as may be obtained. Nothing in this Lease shall require Landlord to relet or make any attempt to relet the Premises, and any reletting shall be done by Landlord as agent for Tenant. In case the Premises are relet, Tenant shall pay the difference between the amount of rent

- 10 -

payable during the remainder of the term and the net rent actually received by Landlord during the term after deducting all expenses for repairs, alterations, recovering possession and reletting the same, which difference shall either (i) accrue and be payable monthly, or (ii) be accelerated and become payable at once, at Landlord's sole option.

20.4.   **No Termination.**  No actions taken by Landlord after Tenant's default shall be construed as indicating a termination of this Lease.  This Lease shall remain in full force and effect and shall not be terminated unless Landlord so elects in writing.

20.5.   **Cure.**  At Landlord's election, Landlord may cure any default of Tenant by expending money, contracting for the making of repairs, purchasing insurance, or by any other actions.  If Landlord takes any such actions, Tenant will immediately upon demand reimburse Landlord for all of Landlord's expenses.  All such expenses shall bear interest from the dates they are incurred until the dates they are paid, at an annual rate equal to the rate set forth in Section 3.2 above.

20.6.   **Costs and Expenses.**  Landlord shall be entitled to recover from Tenant all of Landlord's expenses in exercising any of its rights under this Lease, including without limitation Landlord's attorney's fees and expenses.

20.7.   **Remedies Cumulative.**  All of Landlord' remedies are cumulative, and may be exercised successively or concurrently, at Landlord's election.

20.8.   **No Counterclaims.**  Tenant agrees not to make any counterclaim of any nature in any proceedings brought in connection with this Lease.  This agreement shall not, however, prohibit the maintenance of any claim in a separate action.  Tenant waives any rights it may have to redeem the Premises from any re-entry and possession by Landlord.  Any breaches of any covenants of this Lease shall be material breaches entitling Landlord to its remedies, regardless of the extent of actual damage.

21.   **Waivers.**  Any waiver, consent or approval on the part of Landlord must be in writing, and shall be effective only to the extent specifically set forth in the writing. No delay or omission by Landlord in the exercise of any right or remedy with respect to any one occasion shall impair Landlord's ability to exercise the right or remedy in the same or on another occasion.

22.   **Notices.**  All notices or other communications shall be in writing signed by the sender, and shall either be (a) personally delivered or (b) mailed by certified mail, at or to the following addresses:

Landlord:      New Lifestyles, Inc.
c/o Kenneth L. Cuave, President
P. O. Box 64
Winchester, VA  22604
(540) 722-4521
drkuaye@newlifestyle.net

- 11 -

| Copy To: | William A. Truban, Jr. |
|---|---|
| | Owen and Truban, PLC |
| | P. O. Box 267 |
| | Winchester, VA  22604 |
| | (540) 678-0995 |
| | btruban@owentruban.com |
| | |
| Tenant: | CALO Young Adult - Winchester, LLC |
| | P.O. Box 1810 |
| | Lake Ozark, Missouri 65049 |

Either party may change the address by written notice to the other.  Notices shall be effective when received (if personally delivered) or when deposited in the United States Mail (if mailed by certified mail), or if sent via email, upon receipt of a reply email confirming such notice has been received.

23.   **Return of Premises.**

23.1.   **Condition of Premises.**  At the termination of this Lease, Tenant agrees to deliver to Landlord the Premises and all mechanical systems and all equipment and fixtures thereon in good working order and condition.

23.2.   **Holdover Tenancy.**  Should Tenant fail to vacate the Premises at the termination of this Lease, Tenant shall pay for each day of the holdover period either (a) twice the then-applicable rent, or (b) a current fair market rent for the Premises (as determined by Landlord in its sole judgment), whichever is higher.  All the terms and provisions of this Lease shall continue to apply.  Tenant will be a tenant at will during the holdover period.  Nothing in this section shall be a waiver of or preclude the exercise of Landlord's remedies for Tenant's default.  Should Tenant's holdover prevent Landlord from fulfilling the terms of another Lease, Tenant shall defend and indemnify Landlord from all direct and consequential damages for which Landlord may be liable, or which Landlord may suffer, as a result thereof.

24.   **Quiet Enjoyment.**  Neither Landlord nor Landlord's successors or assigns will disturb Tenant in its quiet enjoyment of the Premises.

25.   **Indemnity.**  Tenant shall indemnify, defend, and hold harmless Landlord from and against any and all damage, expense, claim, liability or loss including reasonable attorneys' fees arising out of or in any way connected to any condition occurring on the Premises or arising out of any use of the Premises during the term of this Lease.  This duty to indemnify and defend shall include but shall not be limited to damages, costs, liability, loss and expense including professional consultant, engineering or attorneys' fees incurred in responding to federal, state, or local laws, strict liability, or common law.  Tenant shall ensure that its liability insurance policy covers its obligations under this indemnity agreement.

- 12 -

26.    Waiver of Subrogation.  Landlord and Tenant each respectively waive all rights of recovery against the other and the other's agents, employees, permitted licenses and assignees, for any loss or damage to Premises or injury to or death of persons, to the extent the same is covered or indemnified by proceeds of any insurance policy which either of the parties hereunder is required to carry under the terms of this Lease (whether or not such party is actually maintaining such insurance coverage), or for which reimbursement is otherwise received.  This agreement, however, shall apply only so long as the parties' respective insurance companies expressly concur in this agreement and waive all subrogation rights.  Each party shall have a continuing obligation to notify the other party if these waivers are not granted.  Nothing in this section shall impose any greater liability upon the Landlord than would have existed in the absence of this section.  The parties specifically recognize and acknowledge that the waivers contained herein are and shall be effective even though such claims may arise as a result of the negligence of the party being released hereunder, or such party's agents, officers or employees.

27.    Attornment.  Tenant agrees to and does attorn to any successor to Landlord's interest in all or any part of the Premises, including without limitation any purchaser at any foreclosure sale of all or any part of the Premises.

28.    Owner.  Owner joins in this lease and agrees that so long as Landlord is renting the above Property to Tenant, Owner will lease the same to Landlord.  Furthermore, if Tenant exercises any rights under Sections 13 (Right of First Refusal) and 14 (Option), above, Owner agrees to be bound by the terms and conditions of this lease so as to convey such Property under such terms (just as if Owner were the Landlord hereunder).  Owner warrants and represents it is owned 100% by Kenneth Cuave.

29.    Successors and Assigns.  This Lease shall inure to the benefit of and be binding upon the heirs, estates, executors, administrators, receivers, custodians, successors and (in the case of Tenant, permitted) assigns of the respective parties.

29.    Memorandum of Lease.  Neither this Lease nor any memorandum or other evidence thereof shall be filed of public record by either party.

- 13 -

INTENDING to be fully bound, the parties have executed this Lease the day and year above written.

**Landlord:**                              **NEW LIFESTYLES, INC.**

a Virginia corporation

By: _Kenneth Cuave_____
Kenneth Cuave, President

**Tenant:**                                **CALO YOUNG ADULTS – WINCHESTER, LLC**

a Virginia limited liability company

By:_____
Print Name_____
Print Title:_____

**Owner:**

**PROPERTIES OF WINCHESTER, LLC**

By: _Kenneth Cuave_____
Kenneth Chave, Member

- 14 -

**Exhibit A**

**Tax Map Info and Deed For Property**

24849708v1
DRAFT 11/19/15 3:11 PM

## Renfo Property Information Form

_Exhibit A_

### Property Information

| | | | | | |
|---|---|---|---|---|---|
| Area WINC | Dist | | Rec # | 3,595.01 | Map Id 172-01-B- 4 |
| Description 304 AMHERST STREET | | | | | |
| Address 304 AMHERST ST | | | | Acres | 0.30 |
| Land Value | 140,000 | Zoning MR | | Elec / Gas | Y / Y |
| Bldg Value | 265,900 | Esmt / ROW PAVE / PUBL | | Water / Sewer | PUBL / PUBL |
| Total Value | 405,900 | Character OPEN | | Deed Ref Bk / Pg | 13/3505 |
| LU Value | | Land Use SFAM | | Sale Price / Parcels | 263,201 |
| Tax Amount | 3,693.69 | Occupancy SFAM | | Sale Date | 12/30/2013 |

### Owner Information

Name PROPERTIES OF WINCHESTER LLC

Address P O BOX 64

WINCHESTER, VA 22604

### Building Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Bldg Sq Ft | 3,150 | Stories | 2 | Units | 1 | Year Built | 1880 |
| Bsmt Sq Ft | | Air Cond | Y | Garage / # | | Condition | AVG |
| Bsmt Fin SF | | Fireplace | 2 | Carport / # | | Rooms | 9 |
| Basement CELL | | Flue | | Heat FHA | | Bedrooms | 4 |
| Foundation BRIK | | Roof Type GABL | | Fuel GAS | | Fullbaths | 3 |
| Walls Ex / In FRAM / | | Roof Matl METL | | Floor COMB | | Halfbaths | 1 |

The information contained herein is deemed reliable but NOT GUARANTEED. The official city or county records must be checked to verify the accuracy of this information.

#30003505                                    000  0089

This Insurance Underwriter eximpts to the preparer
TAX MAP/GPIN 172-1-B-4
PREPARED BY AN ATTORNEY LICENSED TO
PRACTICE LAW IN THE COMMONWEALTH

5377
Boutwell

Sam K Turner, Esq
Bar No. 75528

SAMUEL I. WHITE, P.C.,
SUBSTITUTE TRUSTEE
TO                                           DEED OF FORECLOSURE

PROPERTIES OF WINCHESTER, LLC

Consideration: $268,201.00
Value: $356,100.00

THIS DEED, dated December 9, 2013, by and between SAMUEL I. WHITE, P.C., a Professional Corporation, Substitute Trustee, of the City of Virginia Beach, Virginia, the original deed of trust maker(s) Rodney D. Boutwell and Mary Anne Boutwell; together the Grantors; and Properties of Winchester, LLC, Grantee, whose address is: Post Office Box 64, Winchester, Virginia 22604.

WHEREAS, by deed of trust dated August 17, 2006, and recorded in the Office of the Clerk of the Circuit Court of the City of Winchester County, Virginia, as Instrument Number 060004070, Rodney D. Boutwell and Mary Anne Boutwell did grant and convey the hereinafter described property to R. Brian Ball and Paul S. Bliley, Trustee(s), in trust, to secure the payment of the principal sum of $472,000.00, with interest thereon as evidenced by one negotiable promissory note; and

WHEREAS, by instrument recorded in the Clerk's Office, Samuel I. White, P.C. was appointed Substitute Trustee, under the Deed of Trust; and

WHEREAS, the Deed of Trust provides that upon default the Trustee, upon request of the creditor(s) secured thereby, may sell the secured property at public auction after having first advertised the time, place and terms of said sale in a newspaper published or having a general circulation in the City of Winchester, Virginia; and

WHEREAS, default occurred and at the request of the creditor, the Substitute Trustee, after having advertised the time, place and terms of sale once a week for two (2) consecutive weeks in a newspaper having a general circulation in the City of Winchester County, Virginia, and after providing notice of sale to the property owner(s) as required by Section 55-59.1, Code of Virginia 1950, as amended, sold the property on December 9, 2013 at public auction at the entrance to the City of Winchester County Courthouse, Winchester Virginia, to Properties of Winchester, LLC, the highest and last bidder, for $268,201.00; and

WHEREAS, the Substitute Trustee asserts, to the best of its knowledge and belief, that the party/parties in interest is/are not protected from foreclosure by the Servicemembers Civil Relief Act.

1

000   0070

THEREFORE, in consideration of the sum of $268,201.00 paid by Properties of Winchester, LLC to the Substitute Trustee, the Substitute Trustee does hereby grant and convey with SPECIAL WARRANTY, unto Properties of Winchester, LLC, the following described property, to-wit:

All of that certain lot or parcel of land, lying and being situate in the City of Winchester, Virginia, known as 304 Amherst Street, on the north side of said street, on the east side of Morgan Street and on the south side of those two tracts of land conveyed out by Elizabeth Kern, single, to Thomas Lane Kinney, et al, by deed dated May 19, 1987 and recorded in the Office of the Clerk of the Circuit Court for the City of Winchester, Virginia, in Deed Book 112 at page 630; and further described by plat and survey of Carrington S. Cobbs, C.L.S. dated October 8, 1990 recorded in the aforesaid Clerk's Office in Deed Book 245, at page 809 and further described by plat and survey of Carrington S. Cobbs, C.L.S. dated September 10, 1993 recorded in the aforesaid Clerk's Office in Deed Book 260 at page 809 incorporated by reference as if set out in full.

This conveyance is made subject to all restrictions, easements, and rights of way of record affecting the aforesaid real estate.

2

000   0071

IN WITNESS WHEREOF, the Substitute Trustee has caused this deed to be executed in its corporate name by Sara K. Turner, Vice-President, pursuant to proper authority.

SAMUEL I. WHITE, P.C.
Substitute Trustee

B: _____
Sara K. Turner, Vice President

STATE OF VIRGINIA

CITY OF VIRGINIA BEACH, to-wit:

The foregoing instrument was acknowledged before me this _____ day of _____, 20___ by Sara K. Turner, Vice-President, of Samuel I. White, P.C., Substitute Trustee, a Virginia corporation, on behalf of the corporation, who is personally known to me.

_____
Notary Public

My Commission Expires: _____

Prepared by:
SAMUEL I. WHITE, P.C.
5040 Corporate Woods Drive, Suite 120
Virginia Beach, VA 23462

INSTRUMENT #130000505
RECORDED IN THE CLERK'S OFFICE OF
WINCHESTER ON
DECEMBER 30, 2013 AT 03:38PM
$356.50 GRANTOR TAX WAS PAID AS
REQUIRED BY SEC 58.1-802 OF THE VA. CODE
STATE:    $178.25   LOCAL:    $178.25

TERRY H. WHITTLE, CLERK
RECORDED BY: KM9

3

**STANDARD COMMERCIAL LEASE**

THIS LEASE ("Lease") is made this 20th day of November, 2015, by and between NEW LIFESTYLE, INC., a Virginia corporation (hereinafter "Landlord") and CALO YOUNG ADULTS - WINCHESTER, LLC, a Delaware limited liability company (hereinafter "Tenant"), and PROPERTIES OF WINCHESTER, LLC ("Owner")

1. **Leased Premises.** Landlord leases to Tenant, and Tenant leases from Landlord, the following described premises and all the improvements situated on the premises (hereinafter, in whole or in part, the "Premises"), in the City of Winchester, Virginia:

| Property | Tax Map Number | Permitted Use | Monthly Rent |
|---|---|---|---|
| 309 Amherst Street | 172-01-D-5 | Residential | $ 2,500 |

See Exhibit A for additional description of the Premises – with Exhibit "A" attached hereto and incorporated herein by this reference, with such property hereinafter referred to as the "Premises" and the improvements hereinafter referred to as the "Building."

The Premises include furniture and equipment and that is being included in the lease hereunder. Such furniture and equipment shall remain the property of the Landlord. Tenant shall maintain such furniture and equipment in good condition and replace the same if broken. If Tenant no longer desires any such furniture and equipment to remain in the Premises, Tenant shall notify Landlord of the same and Landlord shall have 10 business days to remove the same.

2. **Use.** The Premises shall be used only for a young adult transitional program and associated uses related thereto – with the permitted use the Premises set forth in Section 1 above. The Premises shall not be used for any other purpose without Landlord's prior written consent. Tenant shall not commit or allow any waste, nuisance, or other such act or omission to occur on the Premises, and shall not do any act or allow on the Premises any condition which may disturb the quiet enjoyment of other tenants of the Building or those occupying surrounding properties. Tenant shall comply with all laws in its usage of such properties and if changes are required to such properties due to such use, Tenant shall be responsible for the same.

- 1 -

24849701v1



3.    **Base Rent.**

    3.1.    **Base Rent Amount.** Tenant agrees to pay as Monthly Base Rent for each property in the amounts set forth above, payable in advance on the fifth day of each calendar month during the term of this Lease.

    3.2.    **Late Payments.** Any rent payments received by Landlord more than five (5) days late shall bear a late payment fee of $100 per property rent that is late, and interest from the dates they are due until the dates they are paid, at an annual rate equal to two percentage points over the prime rate as announced from time to time in *The Wall Street Journal*, recomputed and modified on the first day of each and every calendar month. In the event the above publication is no longer published, then Landlord shall choose another generally accepted and widely published prime rate.

    3.3.    **Annual Increases.** The amount of the Base Rent shall be increased once each third lease year, as of the first day of the first month of the Lease year, by three percent (3%) over the amount thereof for the preceding three lease years, including renewal terms. The new Base Rent amount shall be payable beginning with the first month of the lease year, without the requirement of any notice from Landlord to Tenant.

4.    **Term.**

    4.1.    **Initial Lease Term.** This Lease shall be for an initial term of three years and 41 days, commencing November 20, 2015, and ending at midnight on December 31, 2018.

    4.2.    **Automatic Renewal.** If this Lease is in force on the expiration date of the initial term, and if the Tenant on that date has fully performed all its obligations under this Lease, this Lease shall automatically renew for one year terms thereafter. This automatic renewal option shall continue from year to year until terminated by written notice from Tenant to Landlord no later than thirty (30) days prior to the expiration of the then-current term. The same terms which apply during the initial term shall apply during the extension.

    5.    **Condition of Premises.** Tenant has inspected and knows the condition of the Premises, and accepts the same in their present condition. By its execution of this Lease, Tenant acknowledges that Landlord has made no warranties, representations or statements whatsoever concerning any condition or matter relating to the Premises, including such matters as the income or expenses of the Premises, title to the Premises, legal status of the Premises, availability or cost of utilities, or physical condition of the Premises or any improvements thereon. Tenant further acknowledges that no agents, employees, brokers or other persons are authorized to make any representations or warranties for Landlord. Landlord has relied upon these acknowledgments as a material inducement to enter into this Lease. Tenant is hereby leasing the Premises "as is" and "where is" and agrees that it relies upon no warranties, representations or statements by Landlord or any other persons for Landlord in entering into this Lease. Tenant

-2-

acknowledges that there is in and about the Premises nothing dangerous to life, limb, health or property, and Tenant hereby knowingly and deliberately waives any claim for damages which it may have against Landlord that may arise from any defects in or about the Premises after the execution hereof.

6.      Utilities. Tenant shall be responsible for any and all utility and service costs of the Premises, including, without limitation, all charges for gas, water, electricity, sanitary sewer, telephone, cable television, internet access, trash removal and any other utilities or similar services used at or in connection with the Premises.

7.      Tenant's Taxes. Tenant shall timely pay or cause to be paid when due all real estate, personal property, sales, use and other taxes or assessments, general or special, now or hereafter imposed by any federal, state, or local government on the Tenant's property located in or used in connection with the Premises or on the ownership, lease, sale, possession or use of the Premises, whether the same are assessed against Landlord or Tenant. If any such tax is assessed against Landlord, Landlord shall provide Tenant with written notice of the assessment. Upon demand Tenant shall provide Landlord with proof of all required payments.

8.      **Insurance.**

8.1.    **Fire and Extended Coverage.** Landlord shall obtain "all risk" (sometimes called "open perils" or "special perils") fire and extended coverage insurance on the Building, including fixtures and non-removable tenant improvements, in such amount as Landlord deems sufficient. Tenant shall cooperate with Landlord so that the lowest insurance rating can be obtained, given the use and condition of the Premises. Accordingly, Tenant shall fully cooperate with the insurance carrier in implementing any measures or complying with any requirements the carrier may have. All costs of such measures or compliance shall be borne by Tenant. If the insurance rates published by the Insurance Service Office of the State of are increased as the result of any activities or hazards introduced by Tenant, then Tenant shall pay the incremental cost thereof, promptly upon demand.

8.2.    **Liability.** At its sole cost and expense, Tenant shall purchase and maintain commercial general liability insurance on the Premises, including a property damage provision, insuring against liability for injury to persons or property occurring on or about the Premises or arising out of the ownership, maintenance, use or occupancy of the Premises. The insurance shall be in an amount not less than One Million Dollars ($1,000,000) combined single limit per occurrence, and a general policy aggregate of not less than Two Million Dollars ($2,000,000) if such aggregate applies to this policy.

8.3.    **Policy Requirements.** All policies of insurance obtained now or at any future time by Tenant, shall name Landlord, as well as Tenant, as an insured, by means of a separation of insureds clause, sometimes also called a "severability of insureds" or "cross liability" clause. The policies shall also provide that Landlord be given at least thirty (30) days' notice before any cancellation or material modification of the policy.

- 3 -

8.4. **Certificates of Insurance.** Tenant shall furnish to Landlord certificates of insurance evidencing the insurance coverage required by these provisions, and providing that Landlord shall receive thirty (30) days' notice of cancellation or material change in coverage. Within thirty (30) days after each premium payment date Tenant shall furnish Landlord with a copy of the premium bill and evidence of payment.

8.5. **Casualty Damage; Claims.** In the event of casualty damage to the Premises, and if Landlord is carrying the all-risk property insurance, Tenant shall immediately report the damage to Landlord and Landlord shall make whatever claim against the insurance company that Landlord deems advisable. Tenant shall cooperate in connection with the claim and shall be bound by Landlord's actions. In the event of either damage to the Premises by casualty or an assertion of liability, and if Tenant is carrying the applicable insurance policy, Tenant shall immediately report the same to the applicable insurance company and make a claim for insurance proceeds, delivering to Landlord a copy of the claim. Landlord may take such action as it deems necessary regarding the claim, and Tenant shall reimburse Landlord for all of Landlord's costs in connection with Landlord's action, including without limitation any attorney's fees expended by Landlord. Any insurance proceeds shall be paid to Landlord and may be disbursed as Landlord in its sole discretion deems appropriate.

9. **Liens and Encumbrances.**

9.1. **Subordination.** This Lease shall be and hereby is made subject and subordinate to any present or future mortgages, deeds of trust, and other liens or encumbrances executed or consented to by Landlord which do not materially affect Tenant's use of the Premises. The holder of any such lien or encumbrance may notify Tenant in writing of its interest, and in such event Tenant shall send copies of all notices or communications regarding this Lease to the holder of the lien or encumbrance. Such holder shall be entitled to take any action or exercise any rights reserved to Landlord under this Lease.

9.2. **No Further Encumbrance.** Tenant shall not encumber or permit the encumbrance of Premises or this leasehold estate by any mortgage, deed of trust, assignment, collateral assignment, security interest, lien or other charge. If any encumbrance to which Landlord has not consented is created or filed of record against the Premises or this leasehold estate, Tenant shall discharge or cause the discharge of the same within ten days after its creation. Tenant shall defend and indemnify Landlord from all liability, damages and expenses incurred by Landlord which result from any such encumbrance.

9.3. **No Mechanic's Liens.** This Lease does not require Tenant to improve the Premises or construct any improvements or additions on the Premises. Any improvements or additions to the Premises which Tenant might make or permit are for the sole use of Tenant and will not benefit Landlord's reversion. Tenant is not, and shall not be deemed to be, the agent of Landlord in contracting or arranging for any improvement of the Premises or any construction on the Premises.

- 4 -

24849701v1

9.4.    **Indemnification.**  Tenant shall promptly pay all bills for labor done or material or equipment supplied for any construction or repair work done on the Premises.  Failure to promptly pay any such bills shall be a default under this Lease. Tenant shall defend and indemnify Landlord from all liability, damages or expense resulting from any mechanic's lien claims affecting the Premises.

10.    **Maintenance and Repair.**  Tenant shall have the obligation of maintaining the roof, downspouts, exterior walls and foundation of that portion of the Building constituting the Premises, and shall also repair and maintain the general building plumbing, heating, electrical, air conditioning and ventilation systems and equipment which serve the Premises, including any such systems or equipment located outside the Premises but which exclusively serve the Premises.   Tenant shall also maintain in good order and repair all improvements, alterations and additions which Tenant may make to the Premises, including any alterations to the Building which were made in the installation thereof, including roof and wall penetrations.  In addition and without limitation, Tenant shall protect water pipes, heating and air conditioning equipment, plumbing, fixtures, appliances, and sprinkler systems serving the Premises from becoming frozen or damaged by other than ordinary wear and tear.  Tenant shall be responsible for all window glass replacement and for maintenance of light fixtures and lamps throughout the Premises.  Tenant shall be responsible for all cleaning and janitorial services within the Premises, and Landlord shall have no responsibility therefor.  Tenant shall keep the parking lot adjacent to the Premises and all sidewalks, alleys, walkways and asphalted or concrete areas of the Land which serve the Premises clean, sightly, and free of snow and rubbish, and shall keep and maintain the same in good condition, repairing cracks and potholes and replacing the asphalt or concrete when needed.

Landlord shall have no responsibility for any repairs/improvements unless such damage is caused by Landlord.

11.    **Tenant Improvements and Alterations.**

11.1.    **Tenant's Rights.**  At its sole expense, Tenant may, but is not required to, make improvements, alterations or additions to the Premises, subject to Landlord's prior approval, which shall not be unreasonably withheld.    Any improvements, alterations or additions shall be of good workmanship and material and shall not reduce the size or strength of the then existing improvements or of any load bearing wall or structural support.   Landlord makes no representation or warranty concerning whether any such work is permitted by the applicable laws, ordinances, rules and regulations of any applicable governmental authority.  Tenant agrees to obtain all necessary consents, licenses, approvals, and authorizations of any such governmental authorities or utility provider s prior to undertaking any such work.

11.2.    **Payment of Costs; Indemnity.**  Tenant shall promptly pay all bills and expenses resulting from any such improvements, alterations or additions.  Tenant shall defend and indemnify Landlord and its managers and agents from and against any and all claims, losses, costs, expenses, and liabilities arising as a result of or in connection with any work done on or related to the Premises, including any claims for

- 5 -

2484970lv1

damage or injury, and any mechanic's lien claims. Tenant shall fully pay and satisfy any mechanic's liens which may be filed against the Building or any portion of the Land as a result of any of Tenant's work.

11.3.   Ownership of Improvements; Removal.   Any improvements, alterations, additions or fixtures placed on the Premises, whether or not permanently affixed to the Premises, shall become a part of the realty, shall belong to Landlord, and shall remain on and be surrendered with the Premises at the termination of this Lease. No improvements, alterations or additions to the Premises shall be removed without Landlord's prior written consent, although upon Landlord's request Tenant shall remove, at the termination of this Lease, any such improvements, alterations and additions which Landlord may specify. Tenant shall repair all damage caused by any removal, including any damage caused by wall or roof penetrations.

12.   **Assignment or Sublease.**

12.1.   Tenant shall not assign this Lease, sublease the Premises or any part thereof, or allow anyone else to use or occupy any part of the Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed. The parties agree that, in determining whether to grant consent, Landlord may take into consideration the net worth or other creditworthiness of the proposed assignee or subtenant, the nature of such party's proposed use of the Premises or portion thereof, such party's general business reputation and character, the impact which the proposed assignment or sublease would have upon other tenants of the Building or the future value of the Building, and other such factors. Notwithstanding the above, Tenant shall not be required to obtain Landlord's consent in the event that Tenant is sold to a third party or Tenant forms a new entity, which is controlled by Tenant or its affiliates. However, no assignment/sublease shall in any way relieve Tenant of its obligations under this lease.

12.2.   Assignment by Landlord. Landlord may assign this Lease to any subsequent purchaser of the Building or any other entity owned by Kenneth Cuave, and upon such assignment Landlord shall be released from all rights and obligations under the Lease, except for any such rights or obligations accruing and unperformed prior to the date of the sale.

13.   Right of First Refusal of Tenant to Purchase Building or Lease Additional Space.   If at any time during the life of this Lease, including any renewal terms, Landlord receives an offer from a third person for the purchase of the Building or for the leasing of any portion of the Building (other than the Premises) to a party which is not a current tenant of the Building or a party related to a current tenant of the Building, and if Landlord desires to accept the offer, then Landlord shall promptly deliver to Tenant a copy of the offer (if written) or a letter setting forth the terms of the offer (if verbal), and Tenant may within fifteen (15) days thereafter elect to purchase or lease the Building or portion thereof on the same terms as those set forth in the offer. Should Tenant not exercise its right to purchase or lease the Building or portion thereof, and if Landlord does not sell or lease the Building or portion thereof to the third party, then Tenant shall continue to have this right of first refusal in connection with subsequent

- 6 -

offers. If Landlord sells or leases the Building or portion thereof after Tenant's election not to exercise this right, then the sale (if the transaction is a sale) shall be subject to this Lease. If Landlord leases only a portion of the Building, then this right of first refusal shall continue to exist with respect to the remaining portions of the Building.

14.     **Option to Purchase.** In addition to the right of first refusal set forth in the above section, Landlord grants to Tenant an option to purchase the Premises, which option shall commence at the expiration of the Initial Term and at the beginning of the one (1) year automatic renewal terms thereinafter, and terminate at the conclusion of this Lease. For purposes of clarity, the purchase option granted to Tenant shall remain in force during all renewal terms of the Lease. This option may be exercised at any time by Tenant upon giving Landlord a written notice in accordance with Section 22. Should Tenant exercise this purchase option, the parties will be deemed to have entered into the following agreement (the "Agreement") on the date of the notice:

14.1     **Price.** The purchase price of the Premises shall be an amount agreed upon by the parties, with any Tenant Improvements valued in as provided below. If the parties cannot agree, they shall choose a certified real estate appraiser and the two appraisers so chosen shall select a third, and the three shall conduct independent appraisals of the then current fair market value of the Premises using the sales comparison approach, with Tenant Improvements valued as provided below, the highest and lowest appraisal to be rejected and the purchase price to be the amount of the middle appraisal. Each party shall pay the fees of the appraiser it selects, and the two shall equally share the fees of the third.

Value of Improvements: Tenant may make certain improvements after the execution of this lease – with improvements being defined as substantial changes to the building, i.e. new roof, new HVAC, additions the Property, etc. but not just ordinary repairs/maintenance. Furthermore, if improvement is being made due to fault of Tenant of its occupants, then no value shall be assigned to that improvement, e.g. resident runs ~Tenant into outside compressor and requires it to be replaced. ~~Landlord shall~~ keep an ongoing ~Landloid record of any improvements to the Property and provide ~~the same to Tenant~~ each year. ~Landbid As provided above, ~~Landlord~~ shall also notify ~~Tenant~~ of any improvements prior to being made so that ~~Tenant~~ can discuss classification at that time (improvement versus repair).

*Tenant*

*Landbid*

If the parties can agree upon a value for the Property, the value assigned the improvements shall also be part of that agreement, but with the general understanding and intent being that improvements will be valued based on a 10 years life, with straight line depreciation over that 10 year period.

~~If the~~ Property is to be appraised, the appraisers will be given a list of the improvements as asked to factor in a with and without valuation, and such improvements shall be valued accordingly and the purchase price shall be the "without improvement valuation."

14.2     **Payment of Price.** The entire purchase price shall be paid in cash at closing unless the parties mutually agree upon other terms at that time.

- 7 -

24849701v1

14.3.   **Title Insurance.** Landlord shall furnish to Tenant a commitment for an owner's policy of title insurance in the amount of the purchase price from a title insurance company authorized to issue title insurance policies in the state in which the Premises are located. Delivery of a commitment for such a policy will be made to Tenant within twenty five days of the date the parties are deemed to have entered into this Agreement, the insurance policy itself to be issued at Landlord's expense following the recording of the deed. Tenant shall have ten (10) days after delivery of the commitment to examine it and to advise Landlord in writing of any exceptions which are reasonably objectionable to Tenant. In the absence of such a notice, title will conclusively be presumed to be satisfactory to Tenant. Landlord shall have until the closing date to correct any objections to title and have them shown on a revised title insurance commitment. If Landlord is receiving a mortgage or deed of trust at closing, Tenant shall provide at its expense a loan policy of title insurance.

14.4.   **Casualty Damage.** If prior to the closing date the buildings and improvements situated on the Premises are destroyed or substantially damaged by fire, lightning or other cause that could be covered by extended coverage insurance, Tenant shall purchase the Premises under this Agreement, but shall be entitled to receive at closing either (a) all the insurance proceeds, or (b) an assignment of Landlord's right to receive the insurance proceeds.

14.5.   **Closing.** The closing of this transaction shall take place two months after the date of this Agreement, at 10:00 A.M. in the office of the title insurance company issuing the title insurance commitment, or at such other place or time as the parties may agree. At closing, Landlord shall deliver to Tenant an executed deed conveying the Premises to Tenant, and Tenant shall deliver to Landlord the cash, notes, mortgage, deed of trust, or other documents evidencing its satisfaction of the purchase price. Tenant shall pay all closing costs except for the owner's title insurance policy premium.

15.   **Inspection.** Landlord and its agents may enter the Premises at reasonable hours to examine the same and do anything required of Landlord by this Lease. During the last 120 days of the Lease term, Landlord may display a "For Rent" sign on the Premises, and show the Premises to prospective tenants.

16.   **Tenant's Personality.** Landlord shall not be liable for any loss or damage to any of Tenant's merchandise, personality or other Premises on or about the Premises regardless of the cause of the loss or damage. Tenant shall be responsible for any taxes or assessments made against such Premises, and shall defend and indemnify Landlord against the same.

17.   **Eminent Domain.** If any part of the Building is taken under the power of eminent domain, conveyed in lieu of condemnation, or acquired for any public or quasi-public use, this Lease may be terminated by Landlord, at its sole option. Landlord shall be entitled to all award or compensation without apportionment. Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease.

18.   **Damage By Casualty.**

- 8 -

24849701v1

18.1.   **Total Untenantability.** If a substantial part of the Premises is so damaged by fire or other casualty that the Premises are totally untenantable, Landlord may at its sole option terminate this Lease. If the Lease is so canceled, rent shall be paid only to the date of cancellation and Tenant shall immediately surrender Premises to Landlord.   If Landlord does not elect to terminate this Lease in case of total untenantability, this Lease shall continue in full force and effect and Landlord shall restore the Premises to at least their previous condition, within a reasonable time. For that purpose, Landlord and its agents and contractors may enter the Premises. Rent shall abate during the period of untenantability. Landlord shall be entitled to all insurance proceeds, including any proceeds from Tenant's insurance policies to the extent the same cover Building fixtures, equipment, systems and materials that need to be replaced as part of the repair of the Building.

18.2.   **Partial Untenantability.** If the Premises are so damaged by fire or other casualty that tenantability is only partially disturbed, this Lease shall not terminate and Landlord shall restore the Premises to at least their previous condition within a reasonable time.   For that purpose, Landlord and its agents may enter the Premises, and rent shall abate in proportion and duration equal to the partial untenantability of the Premises.   For this purpose, Landlord shall determine the proportion and duration of the partial untenantability, and its determination shall be binding upon both parties. No claims shall be made by or allowed to Tenant by reason of any inconvenience or annoyance arising from the repair work. Landlord shall be entitled to all insurance proceeds, including any proceeds from Tenant's insurance policies to the extent the same cover Building fixtures, equipment, systems and materials that need to be replaced as part of the repair of the Premises.

18.3.   **Removal of Rubbish and Property.** In the event the Premises suffer any casualty damage, Tenant shall within ten days remove any debris or rubbish, remove its personal Premises from the damaged Premises, and clean the damaged Premises to facilitate repair or restoring operations.

19.   **Default By Landlord.** Tenant shall give Landlord written notice of any default by Landlord. If (a) the default is not cured within thirty (30) days after Landlord receives the written notice, or (b) Landlord does not within that thirty (30)-day time period take actions which, if continued with reasonable diligence, will cure the default, then Tenant at its election may declare this Lease terminated after an additional period of thirty days. If this Lease is rightfully terminated in accordance with this section, rent shall be paid only to the end of the second thirty (30)-day period. Tenant shall look solely to Landlord's equity in the Premises for satisfaction of any remedies of Tenant in the event of Landlord's breach.

20.   **Default By Tenant.**

20.1.   **Events of Default.** Tenant will be in default under this Lease upon the happening of any one or more of the following events:

-9-

(a) Failure of Tenant to timely make any rent payment within ten (10) days after notification by Landlord or to fully perform any obligation contained in this Lease.

(b) Any warranty, representation or statement made or furnished to Landlord by or on behalf of Tenant for the purpose of inducing the execution of this Lease, or any other agreement between the parties proves to have been false in any material respect when made or furnished.

(c) Tenant is dissolved or its existence terminated; Tenant becomes insolvent, its business fails, or a receiver is appointed for any of Tenant's Premises; Tenant is generally not paying its debts as they become due; or Tenant makes an assignment for the benefit of its creditors or is the subject of any voluntary or involuntary bankruptcy or insolvency proceeding.

(d) Any of the occurrences set forth in this section above occurs with respect to any guarantor or surety of Tenant's obligations.

(e) Tenant abandons the Premises, or the Premises or Tenant's leasehold interest in the Premises are attached or taken under any court order or writ of execution.

20.2.   **Rights of Landlord.** If Tenant defaults, Landlord may re-enter the Premises and take possession of the Premises, with or without force or legal process, and without notice or demand. The service of notice, demand and legal process are waived by Tenant. Upon its entry, Landlord may prevent Tenant's entry upon the Premises, without being liable to Tenant for any damages or for prosecution. Without limitation, Landlord may enforce its rights by an action for rent and possession, unlawful detainer, or other legal remedy. Tenant agrees that, notwithstanding Landlord's re-entry and possession of the Premises, Tenant shall remain liable for and shall pay Landlord an amount equal to the entire rent payable to the end of the then-applicable term of this Lease. This amount may either (i) be accelerated and become payable at once, or (ii) become due and be payable monthly, at the sole option of Landlord. In addition, Tenant shall be liable for and shall pay to Landlord any loss or deficiency sustained by Landlord because of Tenant's default.

20.3.   **Reletting Premises.** Notwithstanding Landlord's re-entry and possession of the Premises, Landlord upon Tenant's default shall have the right, without notice to Tenant, and without terminating this Lease, to make alterations and repairs for the purpose of reletting the Premises. Landlord may relet or attempt to relet the Premises or any part of the Premises for the remainder of the then-applicable Lease term or for any longer or shorter period as opportunity may offer, to such persons and at such rent as may be obtained. Nothing in this Lease shall require Landlord to relet or make any attempt to relet the Premises, and any reletting shall be done by Landlord as agent for Tenant. In case the Premises are relet, Tenant shall pay the difference between the amount of rent

- 10 -

payable during the remainder of the term and the net rent actually received by Landlord during the term after deducting all expenses for repairs, alterations, recovering possession and reletting the same, which difference shall either (i) accrue and be payable monthly, or (ii) be accelerated and become payable at once, at Landlord's sole option.

**20.4.   No Termination.**   No actions taken by Landlord after Tenant's default shall be construed as indicating a termination of this Lease.  This Lease shall remain in full force and effect and shall not be terminated unless Landlord so elects in writing.

**20.5.   Cure.**   At Landlord's election, Landlord may cure any default of Tenant by expending money, contracting for the making of repairs, purchasing insurance, or by any other actions.  If Landlord takes any such actions, Tenant will immediately upon demand reimburse Landlord for all of Landlord's expenses.  All such expenses shall bear interest from the dates they are incurred until the dates they are paid, at an annual rate equal to the rate set forth in Section 3.2 above.

**20.6.   Costs and Expenses.**   Landlord shall be entitled to recover from Tenant all of Landlord's expenses in exercising any of its rights under this Lease, including without limitation Landlord's attorney's fees and expenses.

**20.7.   Remedies Cumulative.**   All of Landlord' remedies are cumulative, and may be exercised successively or concurrently, at Landlord's election.

**20.8.   No Counterclaims.**   Tenant agrees not to make any counterclaim of any nature in any proceedings brought in connection with this Lease.  This agreement shall not, however, prohibit the maintenance of any claim in a separate action.  Tenant waives any rights it may have to redeem the Premises from any re-entry and possession by Landlord.  Any breaches of any covenants of this Lease shall be material breaches entitling Landlord to its remedies, regardless of the extent of actual damage.

**21.   Waivers.**   Any waiver, consent or approval on the part of Landlord must be in writing, and shall be effective only to the extent specifically set forth in the writing.  No delay or omission by Landlord in the exercise of any right or remedy with respect to any one occasion shall impair Landlord's ability to exercise the right or remedy in the same or on another occasion.

**22.   Notices.**   All notices or other communications shall be in writing signed by the sender, and shall either be (a) personally delivered or (b) mailed by certified mail, at or to the following addresses:

Landlord:     New Lifestyles, Inc.
              c/o Kenneth L. Cuave, President
              P. O. Box 64
              Winchester, VA  22604
              (540) 722-4521
              drkuave@newlifestyle.net

- 11 -

24449701v1

| Copy To: | William A. Truban, Jr. |
| | Owen and Truban, PLC |
| | P. O. Box 267 |
| | Winchester, VA  22604 |
| | (540) 678-0995 |
| | btruban@owentruban.com |

| Tenant: | CALO Young Adult - Winchester, LLC |
| | P.O. Box 1810 |
| | Lake Ozark, Missouri 65049 |

Either party may change the address by written notice to the other.  Notices shall be effective when received (if personally delivered) or when deposited in the United States Mail (if mailed by certified mail), or if sent via email, upon receipt of a reply email confirming such notice has been received.

23.     **Return of Premises.**

23.1.    **Condition of Premises.**  At the termination of this Lease, Tenant agrees to deliver to Landlord the Premises and all mechanical systems and all equipment and fixtures thereon in good working order and condition.

23.2.    **Holdover Tenancy.**  Should Tenant fail to vacate the Premises at the termination of this Lease, Tenant shall pay for each day of the holdover period either (a) twice the then-applicable rent, or (b) a current fair market rent for the Premises (as determined by Landlord in its sole judgment), whichever is higher.  All the terms and provisions of this Lease shall continue to apply.  Tenant will be a tenant at will during the holdover period.  Nothing in this section shall be a waiver of or preclude the exercise of Landlord's remedies for Tenant's default.  Should Tenant's holdover prevent Landlord from fulfilling the terms of another Lease, Tenant shall defend and indemnify Landlord from all direct and consequential damages for which Landlord may be liable, or which Landlord may suffer, as a result thereof.

24.     **Quiet Enjoyment.**  Neither Landlord nor Landlord's successors or assigns will disturb Tenant in its quiet enjoyment of the Premises.

25.     **Indemnity.**  Tenant shall indemnify, defend, and hold harmless Landlord from and against any and all damage, expense, claim, liability or loss including reasonable attorneys' fees arising out of or in any way connected to any condition occurring on the Premises or arising out of any use of the Premises during the term of this Lease.  This duty to indemnify and defend shall include but shall not be limited to damages, costs, liability, loss and expense including professional consultant, engineering or attorneys' fees incurred in responding to federal, state, or local laws, strict liability, or common law.  Tenant shall ensure that its liability insurance policy covers its obligations under this indemnity agreement.

- 12 -

24849701v1

26.     **Waiver of Subrogation.**  Landlord and Tenant each respectively waive all rights of recovery against the other and the other's agents, employees, permitted licenses and assignees, for any loss or damage to Premises or injury to or death of persons, to the extent the same is covered or indemnified by proceeds of any insurance policy which either of the parties hereunder is required to carry under the terms of this Lease (whether or not such party is actually maintaining such insurance coverage), or for which reimbursement is otherwise received.  This agreement, however, shall apply only so long as the parties' respective insurance companies expressly concur in this agreement and waive all subrogation rights.  Each party shall have a continuing obligation to notify the other party if these waivers are not granted.  Nothing in this section shall impose any greater liability upon the Landlord than would have existed in the absence of this section.  The parties specifically recognize and acknowledge that the waivers contained herein are and shall be effective even though such claims may arise as a result of the negligence of the party being released hereunder, or such party's agents, officers or employees.

27.     **Attornment.**  Tenant agrees to and does attorn to any successor to Landlord's interest in all or any part of the Premises, including without limitation any purchaser at any foreclosure sale of all or any part of the Premises.

28.     **Owner.**  Owner joins in this lease and agrees that so long as Landlord is renting the above Property to Tenant, Owner will lease the same to Landlord.  Furthermore, if Tenant exercises any rights under Sections 13 (Right of First Refusal) and 14 (Option), above, Owner agrees to be bound by the terms and conditions of this lease so as to convey such Property under such terms (just as if Owner were the Landlord hereunder).  Owner warrants and represents it is owned 100% by Kenneth Cuave.

29.     **Successors and Assigns.**  This Lease shall inure to the benefit of and be binding upon the heirs, estates, executors, administrators, receivers, custodians, successors and (in the case of Tenant, permitted) assigns of the respective parties.

29.     **Memorandum of Lease.**  Neither this Lease nor any memorandum or other evidence thereof shall be filed of public record by either party.

- 13 -

24849701v1

INTENDING to be fully bound, the parties have executed this Lease the day and year above written.

Landlord:                       NEW LIFESTYLES, INC.

                                a Virginia corporation

                                By: _____
                                Kenneth Cuave, President


Tenant:                         CALO YOUNG ADULTS - WINCHESTER, LLC

                                a Delaware limited liability company

                                By:_____
                                Print Name_____
                                Print Title:_____


Owner:                          PROPERTIES OF WINCHESTER, LLC


                                By: _____
                                Kenneth Cuave, Member

- 14 -

24849701v1

**Exhibit A**

**Tax Map Info and Deed For Property**

- 15 -

## Renfo Property Information Form

Exhibit A

### Property Information

| | | | | | | |
|---|---|---|---|---|---|---|
| **Area** WINC | Dist | | | **Rec #** 1,124.01 | **Map Id** 172-01-D- 5 | |
| **Description** 309 AMHERST STREET | | | | | | |
| **Address** 309 AMHERST ST | | | | | **Acres** 0.17 | |
| **Land Value** | 78,000 | **Zoning** MR | | | **Elec / Gas** Y / N | |
| **Bldg Value** | 134,000 | **Esmt / ROW** PAVE / PUBL | | | **Water / Sewer** PUBL / PUBL | |
| **Total Value** | 209,000 | **Character** RLNG | | | **Deed Ref Bk / Pg** 080002614 | |
| **LU Value** | | **Land Use** SFAM | | | **Sale Price / Parcels** 1/4 | |
| **Tax Amount** | 1,901.90 | **Occupancy** SFAM | | | **Sale Data** 9/25/2008 | |

### Owner Information

**Name** PROPERTIES OF WINCHESTER LLC

**Address** P O BOX 84

WINCHESTER, VA 22604

### Building Information

| | | | | | | |
|---|---|---|---|---|---|---|
| **Bldg Sq Ft** | 2,164 | **Stories** 2 | **Units** 1 | **Year Built** 1930 | | |
| **Bsmt Sq Ft** | 828 | **Air Cond** Y | **Garage / #** | **Condition** GOOD | | |
| **Bsmt Fin SF** | | **Fireplace** | **Carport / #** | **Rooms** 6 | | |
| **Basement** FULL | | **Flue** | **Heat** HWTR | **Bedrooms** 3 | | |
| **Foundation** CONC | | **Roof Type** HIP | **Fuel** OIL | **Fullbaths** 2 | | |
| **Walls Ex / In** BRIK / | | **Roof Matl** SHGL | **Floor** WOOD | **Halfbaths** | | |

The information contained herein is deemed reliable but NOT GUARANTEED. The official city or
county records must be checked to verify the accuracy of this information.

080002614                              00        0

THIS DEED, made and dated this 24 day of September, 2008, by and

between KENNETH L. CUAVE (also known of record as KENNETH

CUAVE), hereinafter called the Grantor; and PROPERTIES OF

WINCHESTER, LLC, a Virginia limited liability company, hereinafter called

the Grantee.

WITNESSETH: That for and in consideration of the sum of Ten Dollars,

and other valuable consideration, the receipt of which is hereby acknowledged,

the Grantor does hereby grant and convey with General Warranty and English

Covenants of title unto the Grantee, in fee simple, the following property:

PARCEL ONE:  All that certain lot or parcel of land, together
with the improvements thereon and the appurtenances thereto
belonging, improved by a dwelling designated as 221 West
Boscawen Street in the City of Winchester, Virginia, fronting
on Boscawen Street a distance of 26 feet, more or less, and
extending back southwardly 124 feet, more or less; AND
BEING the same property conveyed to Kenneth Cuave by deed
dated August 28, 2006, from Cuave Family Properties, LLC, a
Virginia limited liability company, of record in the Clerk's
Office of the Circuit Court of City of Winchester, Virginia as
Instrument No. 060003650. (TAX MAP NO. 192-01-N-6)

PARCEL TWO:  All of that certain lot or parcel of land,
containing 2,728.80 square feet, more or less, improved by a
dwelling house designated 303 Amherst Street, located in the
northwest section of City of Winchester, Virginia, and more
particularly described as Lot 1 on that certain plat of
"Speakman Lots, North Stewart and Amherst Streets" recorded

Consideration: $____ Code: 58-1011 (16)
Grantee Address:  P. O. Box 64
Winchester, Va. 22601

in the Office of the Clerk of the Circuit Court for the City of Winchester, Virginia, in Deed Book 140, at Page 540; and further and more particularly described by plat and survey of Dove & Associates, dated October 10, 1991 recorded in the aforesaid Clerk's Office in Deed Book 249, Page 1404; AND BEING the same property conveyed to Kenneth L. Cuave by deed dated November 18, 2005, from Jack S. Carothers and Patsy C. Carothers, husband and wife, of record in the aforesaid Clerk's Office as Instrument No. 050005838. **(TAX MAP NO. 172-01-D-2)**

**PARCEL THREE:** All of that certain land at 309 Amherst Street in the City of Winchester, Virginia, fronting 40 feet on Amherst Street, more or less, extending a uniform width southerly for 180 feet, more or less, to a joint alley in the rear; bounded on the east by land now or formerly of Buckner, on the west by land now or formerly of Clevenger; AND BEING the same property conveyed to Kenneth Cuave by deed dated September 20, 2006, from Bradford J. Felix and Caroline R. Felix, husband and wife, of record in the Clerk's Office of the Circuit Court of the City of Winchester, Virginia, as Instrument No. 060004008. **(TAX MAP NO. 273-01-D-6)**

**PARCEL FOUR:** All that certain lot or parcel of land, together with all improvements and appurtenances thereto belonging, lying and being situate at Number 411 on the Western Side of South Cameron Street, in the City of Winchester, Virginia, fronting on said street a distance of 50 feet, more or less, and extending back Westward a distance of 110 feet, more or less; AND BEING the same property conveyed to Kenneth L. Cuave by deed dated December 16, 2002, from Laurence O. Sullivan, Jr. and Linda S. Sullivan, his wife, of record in the Clerk's Office of the Circuit Court of the City of Winchester, Virginia, as Instrument No. 020804849. **(TAX MAP NO. 192-1-J-10)**

Reference is hereby made to the aforesaid instruments and the

attachments and the references therein contained, for a more particular

D.B.    6010

description of the property hereby conveyed.

This conveyance is made subject to all easements, rights of way and restrictions of record, if any, affecting the subject property.

WITNESS the following signature and seal:

_Kennith L. Cuave_ (SEAL)
KENNETH L. CUAVE

STATE OF VIRGINIA,
CITY OF WINCHESTER, to-wit:

The foregoing instrument was acknowledged before me in my City and State this 24 day of September, 2008, by KENNETH L. CUAVE.

My Commission Expires: May 31, 2009

_Mary Paula Wilson_
NOTARY PUBLIC

MARY PAULA WILSON
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #158824

INSTRUMENT 080002614
RECORDED IN THE CLERK'S OFFICE OF
WINCHESTER ON
SEPTEMBER 25, 2008 AT 11:54AM
TERRY H. WHITTLE, CLERK
RECORDED BY: KMS

### STANDARD COMMERCIAL LEASE

**THIS LEASE** ("Lease") is made this 20th day of November, 2015, by and between **NEW LIFESTYLE, INC.,** a Virginia corporation (hereinafter **"Landlord"**) and **CALO YOUNG ADULTS - WINCHESTER, LLC,** a Delaware limited liability company (hereinafter **"Tenant"**), and **CUAVE FAMILY PROPERTIES, LLC** (**"Owner"**).

1.     **Leased Premises.** Landlord leases to Tenant, and Tenant leases from Landlord, the following described premises and all the improvements situated on the premises (hereinafter, in whole or in part, the "Premises"), in the City of Winchester, Virginia:

| Property | Tax Map Number | Permitted Use | Monthly Rent |
|---|---|---|---|
| 230 West Boscawen Street | 172-01-C-1 | Office | $ 5,666 |

See Exhibit A for additional description of the Premises – with Exhibit "A" attached hereto and incorporated herein by this reference, with such property hereinafter referred to as the "Premises" and the improvements hereinafter referred to as the "Building."

The Premises include furniture and equipment and that is being included in the lease hereunder.  Such furniture and equipment shall remain the property of the Landlord. Tenant shall maintain such furniture and equipment in good condition and replace the same if broken.  If Tenant no longer desires any such furniture and equipment to remain in the Premises, Tenant shall notify Landlord of the same and Landlord shall have 10 business days to remove the same.

2.     **Use.** The Premises shall be used only for a young adult transitional program and associated uses related thereto – with the permitted use the Premises set forth in Section 1 above.  The Premises shall not be used for any other purpose without Landlord's prior written consent.  Tenant shall not commit or allow any waste, nuisance, or other such act or omission to occur on the Premises, and shall not do any act or allow on the Premises any condition which may disturb the quiet enjoyment of other tenants of the Building or those occupying surrounding properties.  Tenant shall comply with all laws in its usage of such properties and if changes are required to such properties due to such use, Tenant shall be responsible for the same.

- 1 -



3.    **Base Rent.**

    3.1.    **Base Rent Amount.**  Tenant agrees to pay as Monthly Base Rent for each property in the amounts set forth above, payable in advance on the fifth day of each calendar month during the term of this Lease.

    3.2.    **Late Payments.**  Any rent payments received by Landlord more than five (5) days late shall bear a late payment fee of $100 per property rent that is late, and interest from the dates they are due until the dates they are paid, at an annual rate equal to two percentage points over the prime rate as announced from time to time in *The Wall Street Journal*, recomputed and modified on the first day of each and every calendar month. In the event the above publication is no longer published, then Landlord shall choose another generally accepted and widely published prime rate.

    3.3.    **Annual Increases.**  The amount of the Base Rent shall be increased once each third lease year, as of the first day of the first month of the Lease year, by three percent (3%) over the amount thereof for the preceding three lease years, including renewal terms. The new Base Rent amount shall be payable beginning with the first month of the lease year, without the requirement of any notice from Landlord to Tenant.

4.    **Term.**

    4.1.    **Initial Lease Term.**  This Lease shall be for an initial term of three years and 41 days, commencing November 20, 2015, and ending at midnight on December 31, 2018.

    4.2.    **Automatic Renewal.**  If this Lease is in force on the expiration date of the initial term, and if the Tenant on that date has fully performed all its obligations under this Lease, this Lease shall automatically renew for one year terms thereinafter. This automatic renewal option shall continue from year to year until terminated by written notice from Tenant to Landlord no later than thirty (30) days prior to the expiration of the then-current term. The same terms which apply during the initial term shall apply during the extension.

5.    **Condition of Premises.**  Tenant has inspected and knows the condition of the Premises, and accepts the same in their present condition. By its execution of this Lease, Tenant acknowledges that Landlord has made no warranties, representations or statements whatsoever concerning any condition or matter relating to the Premises, including such matters as the income or expenses of the Premises, title to the Premises, legal status of the Premises, availability or cost of utilities, or physical condition of the Premises or any improvements thereon. Tenant further acknowledges that no agents, employees, brokers or other persons are authorized to make any representations or warranties for Landlord. Landlord has relied upon these acknowledgments as a material inducement to enter into this Lease. Tenant is hereby leasing the Premises "as is" and "where is" and agrees that it relies upon no warranties, representations or statements by Landlord or any other persons for Landlord in entering into this Lease. Tenant

- 2 -

24849739v1

acknowledges that there is in and about the Premises nothing dangerous to life, limb, health or property, and Tenant hereby knowingly and deliberately waives any claim for damages which it may have against Landlord that may arise from any defects in or about the Premises after the execution hereof.

6. **Utilities.** Tenant shall be responsible for any and all utility and service costs of the Premises, including, without limitation, all charges for gas, water, electricity, sanitary sewer, telephone, cable television, internet access, trash removal and any other utilities or similar services used at or in connection with the Premises.

7. **Tenant's Taxes.** Tenant shall timely pay or cause to be paid when due all real estate, personal property, sales, use and other taxes or assessments, general or special, now or hereafter imposed by any federal, state, or local government on the Tenant's property located in or used in connection with the Premises or on the ownership, lease, sale, possession or use of the Premises, whether the same are assessed against Landlord or Tenant. If any such tax is assessed against Landlord, Landlord shall provide Tenant with written notice of the assessment. Upon demand Tenant shall provide Landlord with proof of all required payments.

8. **Insurance.**

8.1. **Fire and Extended Coverage.** Landlord shall obtain "all risk" (sometimes called "open perils" or "special perils") fire and extended coverage insurance on the Building, including fixtures and non-removable tenant improvements, in such amount as Landlord deems sufficient. Tenant shall cooperate with Landlord so that the lowest insurance rating can be obtained, given the use and condition of the Premises. Accordingly, Tenant shall fully cooperate with the insurance carrier in implementing any measures or complying with any requirements the carrier may have. All costs of such measures or compliance shall be borne by Tenant. If the insurance rates published by the Insurance Service Office of the State of are increased as the result of any activities or hazards introduced by Tenant, then Tenant shall pay the incremental cost thereof promptly upon demand.

8.2. **Liability.** At its sole cost and expense, Tenant shall purchase and maintain commercial general liability insurance on the Premises, including a property damage provision, insuring against liability for injury to persons or property occurring on or about the Premises or arising out of the ownership, maintenance, use or occupancy of the Premises. The insurance shall be in an amount not less than One Million Dollars ($1,000,000) combined single limit per occurrence, and a general policy aggregate of not less than Two Million Dollars ($2,000,000) if such aggregate applies to this policy.

8.3. **Policy Requirements.** All policies of insurance obtained now or at any future time by Tenant, shall name Landlord, as an insured, by means of a separation of insureds clause, sometimes also called a "severability of insureds" or "cross liability" clause. The policies shall also provide that Landlord be given at least thirty (30) days' notice before any cancellation or material modification of the policy.

- 3 -

24849739v1

**8.4.   Certificates of Insurance.**   Tenant shall furnish to Landlord certificates of insurance evidencing the insurance coverage required by these provisions, and providing that Landlord shall receive thirty (30) days' notice of cancellation or material change in coverage.  Within thirty (30) days after each premium payment date Tenant shall furnish Landlord with a copy of the premium bill and evidence of payment.

**8.5.   Casualty Damage; Claims.**   In the event of casualty damage to the Premises, and if Landlord is carrying the all-risk property insurance, Tenant shall immediately report the damage to Landlord and Landlord shall make whatever claim against the insurance company that Landlord deems advisable.  Tenant shall cooperate in connection with the claim and shall be bound by Landlord's actions.  In the event of either damage to the Premises by casualty or an assertion of liability, and if Tenant is carrying the applicable insurance policy, Tenant shall immediately report the same to the applicable insurance company and make a claim for insurance proceeds, delivering to Landlord a copy of the claim.  Landlord may take such action as it deems necessary regarding the claim, and Tenant shall reimburse Landlord for all of Landlord's costs in connection with Landlord's action, including without limitation any attorney's fees expended by Landlord.  Any insurance proceeds shall be paid to Landlord and may be disbursed as Landlord in its sole discretion deems appropriate.

**9.   Liens and Encumbrances.**

**9.1.   Subordination.**   This Lease shall be and hereby is made subject and subordinate to any present or future mortgages, deeds of trust, and other liens or encumbrances executed or consented to by Landlord which do not materially affect Tenant's use of the Premises.  The holder of any such lien or encumbrance may notify Tenant in writing of its interest, and in such event Tenant shall send copies of all notices or communications regarding this Lease to the holder of the lien or encumbrance.  Such holder shall be entitled to take any action or exercise any rights reserved to Landlord under this Lease.

**9.2.   No Further Encumbrance.**   Tenant shall not encumber or permit the encumbrance of Premises or this leasehold estate by any mortgage, deed of trust, assignment, collateral assignment, security interest, lien or other charge.  If any encumbrance to which Landlord has not consented is created or filed of record against the Premises or this leasehold estate, Tenant shall discharge or cause the discharge of the same within ten days after its creation.  Tenant shall defend and indemnify Landlord from all liability, damages and expenses incurred by Landlord which result from any such encumbrance.

**9.3.   No Mechanic's Liens.**   This Lease does not require Tenant to improve the Premises or construct any improvements or additions on the Premises.  Any improvements or additions to the Premises which Tenant might make or permit are for the sole use of Tenant and will not benefit Landlord's reversion.  Tenant is not, and shall not be deemed to be, the agent of Landlord in contracting or arranging for any improvement of the Premises or any construction on the Premises.

- 4 -

**9.4. Indemnification.** Tenant shall promptly pay all bills for labor done or material or equipment supplied for any construction or repair work done on the Premises. Failure to promptly pay any such bills shall be a default under this Lease. Tenant shall defend and indemnify Landlord from all liability, damages or expense resulting from any mechanic's lien claims affecting the Premises.

**10. Maintenance and Repair.** Tenant shall have the obligation of maintaining the roof, downspouts, exterior walls and foundation of that portion of the Building constituting the Premises, and shall also repair and maintain the general building plumbing, heating, electrical, air conditioning and ventilation systems and equipment which serve the Premises, including any such systems or equipment located outside the Premises but which exclusively serve the Premises. Tenant shall also maintain in good order and repair all improvements, alterations and additions which Tenant may make to the Premises, including any alterations to the Building which were made in the installation thereof, including roof and wall penetrations. In addition and without limitation, Tenant shall protect water pipes, heating and air conditioning equipment, plumbing, fixtures, appliances, and sprinkler systems serving the Premises from becoming frozen or damaged by other than ordinary wear and tear. Tenant shall be responsible for all window glass replacement and for maintenance of light fixtures and lamps throughout the Premises. Tenant shall be responsible for all cleaning and janitorial services within the Premises, and Landlord shall have no responsibility therefor. Tenant shall keep the parking lot adjacent to the Premises and all sidewalks, alleys, walkways and asphalted or concrete areas of the Land which serve the Premises clean, sightly, and free of snow and rubbish, and shall keep and maintain the same in good condition, repairing cracks and potholes and replacing the asphalt or concrete when needed.

Landlord shall have no responsibility for any repairs/improvements unless such damage is caused by Landlord.

**11. Tenant Improvements and Alterations.**

**11.1. Tenant's Rights.** At its sole expense, Tenant may, but is not required to, make improvements, alterations or additions to the Premises, subject to Landlord's prior approval, which shall not be unreasonably withheld. Any improvements, alterations or additions shall be of good workmanship and material and shall not reduce the size or strength of the then existing improvements or of any load bearing wall or structural support. Landlord makes no representation or warranty concerning whether any such work is permitted by the applicable laws, ordinances, rules and regulations of any applicable governmental authority. Tenant agrees to obtain all necessary consents, licenses, approvals, and authorizations of any such governmental authorities or utility provider s prior to undertaking any such work.

**11.2. Payment of Costs; Indemnity.** Tenant shall promptly pay all bills and expenses resulting from any such improvements, alterations or additions. Tenant shall defend and indemnify Landlord and its managers and agents from and against any and all claims, losses, costs, expenses, and liabilities arising as a result of or in connection with any work done on or related to the Premises, including any claims for

- 5 -

24849739v1

damage or injury, and any mechanic's lien claims.  Tenant shall fully pay and satisfy any mechanic's liens which may be filed against the Building or any portion of the Land as a result of any of Tenant's work.

11.3.  **Ownership of Improvements; Removal.**  Any improvements, alterations, additions or fixtures placed on the Premises, whether or not permanently affixed to the Premises, shall become a part of the realty, shall belong to Landlord, and shall remain on and be surrendered with the Premises at the termination of this Lease. No improvements, alterations or additions to the Premises shall be removed without Landlord's prior written consent, although upon Landlord's request Tenant shall remove, at the termination of this Lease, any such improvements, alterations and additions which Landlord may specify.  Tenant shall repair all damage caused by any removal, including any damage caused by wall or roof penetrations.

12.  **Assignment or Sublease.**

12.1.  Tenant shall not assign this Lease, sublease the Premises or any part thereof, or allow anyone else to use or occupy any part of the Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed.  The parties agree that, in determining whether to grant consent, Landlord may take into consideration the net worth or other creditworthiness of the proposed assignee or subtenant, the nature of such party's proposed use of the Premises or portion thereof, such party's general business reputation and character, the impact which the proposed assignment or sublease would have upon other tenants of the Building or the future value of the Building, and other such factors.  Notwithstanding the above, Tenant shall not be required to obtain Landlord's consent in the event that Tenant is sold to a third party or Tenant forms a new entity, which is controlled by Tenant or its affiliates.  However, no assignment/sublease shall in any way relieve Tenant of its obligations under this lease.

12.2.  **Assignment by Landlord.**  Landlord may assign this Lease to any subsequent purchaser of the Building or any other entity owned by Kenneth Cuave, and upon such assignment Landlord shall be released from all rights and obligations under the Lease, except for any such rights or obligations accruing and unperformed prior to the date of the sale.

13.  **Right of First Refusal of Tenant to Purchase Building or Lease Additional Space.**  If at any time during the life of this Lease, including any renewal terms, Landlord receives an offer from a third person for the purchase of the Building or for the leasing of any portion of the Building (other than the Premises) to a party which is not a current tenant of the Building or a party related to a current tenant of the Building, and if Landlord desires to accept the offer, then Landlord shall promptly deliver to Tenant a copy of the offer (if written) or a letter setting forth the terms of the offer (if verbal), and Tenant may within fifteen (15) days thereafter elect to purchase or lease the Building or portion thereof on the same terms as those set forth in the offer.  Should Tenant not exercise its right to purchase or lease the Building or portion thereof, and if Landlord does not sell or lease the Building or portion thereof to the third party, then Tenant shall continue to have this right of first refusal in connection with subsequent

- 6 -

offers. If Landlord sells or leases the Building or portion thereof after Tenant's election not to exercise this right, then the sale (if the transaction is a sale) shall be subject to this Lease. If Landlord leases only a portion of the Building, then this right of first refusal shall continue to exist with respect to the remaining portions of the Building.

      14.    **Option to Purchase.** In addition to the right of first refusal set forth in the above section, Landlord grants to Tenant an option to purchase the Premises, which option shall commence at the expiration of the Initial Term and at the beginning of the one (1) year automatic renewal terms thereinafter, and terminate at the conclusion of this Lease. For purposes of clarity, the purchase option granted to Tenant shall remain in force during all renewal terms of the Lease. This option may be exercised at any time by Tenant upon giving Landlord a written notice in accordance with Section 22. Should Tenant exercise this purchase option, the parties will be deemed to have entered into the following agreement (the "Agreement") on the date of the notice:

      14.1    **Price.** The purchase price of the Premises shall be an amount agreed upon by the parties, with any Tenant Improvements valued in as provided below. If the parties cannot agree, they shall choose a certified real estate appraiser and the two appraisers so chosen shall select a third, and the three shall conduct independent appraisals of the then current fair market value of the Premises using the sales comparison approach, with Tenant Improvements valued as provided below, the highest and lowest appraisal to be rejected and the purchase price to be the amount of the middle appraisal. Each party shall pay the fees of the appraiser it selects, and the two shall equally share the fees of the third.

Value of Improvements: Tenant may make certain improvements after the execution of this lease – with improvements being defined as substantial changes to the building, i.e. new roof, new HVAC, additions the Property, etc. but not just ordinary repairs/maintenance. Furthermore, if improvement is being made due to fault of Tenant ~~Tenant~~ of its occupants, then no value shall be assigned to that improvement, e.g. resident runs into outside compressor and requires it to be replaced. ~~Landlord shall keep an ongoing~~ record of any improvements to the Property and provide the same to ~~Tenant each year.~~ As provided above, ~~Landlord~~ shall also notify ~~Tenant of any Improvements prior to being~~ made so that ~~Tenant~~ can discuss classification at that time (improvement versus repair).

If the parties can agree upon a value for the Property, the value assigned the improvements shall also be part of that agreement, but with the general understanding and intent being that improvements will be valued based on a 10 years life, with straight line depreciation over that 10 year period.

If the Property is to be appraised, the appraisers will be given a list of the improvements as asked to factor in a with and without valuation, and such improvements shall be valued accordingly and the purchase price shall be the "without improvement valuation."

      14.2    **Payment of Price.** The entire purchase price shall be paid in cash at closing unless the parties mutually agree upon other terms at that time.

- 7 -

**14.3.   Title Insurance.** Landlord shall furnish to Tenant a commitment for an owner's policy of title insurance in the amount of the purchase price from a title insurance company authorized to issue title insurance policies in the state in which the Premises are located. Delivery of a commitment for such a policy will be made to Tenant within twenty five days of the date the parties are deemed to have entered into this Agreement, the insurance policy itself to be issued at Landlord's expense following the recording of the deed. Tenant shall have ten (10) days after delivery of the commitment to examine it and to advise Landlord in writing of any exceptions which are reasonably objectionable to Tenant. In the absence of such a notice, title will conclusively be presumed to be satisfactory to Tenant. Landlord shall have until the closing date to correct any objections to title and have them shown on a revised title insurance commitment. If Landlord is receiving a mortgage or deed of trust at closing, Tenant shall provide at its expense a loan policy of title insurance.

**14.4.   Casualty Damage.** If prior to the closing date the buildings and improvements situated on the Premises are destroyed or substantially damaged by fire, lightning or other cause that could be covered by extended coverage insurance, Tenant shall purchase the Premises under this Agreement, but shall be entitled to receive at closing either (a) all the insurance proceeds, or (b) an assignment of Landlord's right to receive the insurance proceeds.

**14.5.   Closing.** The closing of this transaction shall take place two months after the date of this Agreement, at 10:00 A.M. in the office of the title insurance company issuing the title insurance commitment, or at such other place or time as the parties may agree. At closing, Landlord shall deliver to Tenant an executed deed conveying the Premises to Tenant, and Tenant shall deliver to Landlord the cash, notes, mortgage, deed of trust, or other documents evidencing its satisfaction of the purchase price. Tenant shall pay all closing costs except for the owner's title insurance policy premium.

**15.   Inspection.** Landlord and its agents may enter the Premises at reasonable hours to examine the same and do anything required of Landlord by this Lease.  During the last 120 days of the Lease term, Landlord may display a "For Rent" sign on the Premises, and show the Premises to prospective tenants.

**16.   Tenant's Personalty.** Landlord shall not be liable for any loss or damage to any of Tenant's merchandise, personalty or other Premises on or about the Premises regardless of the cause of the loss or damage.  Tenant shall be responsible for any taxes or assessments made against such Premises, and shall defend and indemnify Landlord against the same.

**17.   Eminent Domain.** If any part of the Building is taken under the power of eminent domain, conveyed in lieu of condemnation, or acquired for any public or quasi-public use, this Lease may be terminated by Landlord, at its sole option.  Landlord shall be entitled to all award or compensation without apportionment.  Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease.

**18.   Damage By Casualty.**

- 8 -

18.1.  **Total Untenantability.** If a substantial part of the Premises is so damaged by fire or other casualty that the Premises are totally untenantable, Landlord may at its sole option terminate this Lease. If the Lease is so canceled, rent shall be paid only to the date of cancellation and Tenant shall immediately surrender Premises to Landlord. If Landlord does not elect to terminate this Lease in case of total untenantability, this Lease shall continue in full force and effect and Landlord shall restore the Premises to at least their previous condition, within a reasonable time. For that purpose, Landlord and its agents and contractors may enter the Premises. Rent shall abate during the period of untenantability. Landlord shall be entitled to all insurance proceeds, including any proceeds from Tenant's insurance policies to the extent the same cover Building fixtures, equipment, systems and materials that need to be replaced as part of the repair of the Building.

18.2.  **Partial Untenantability.** If the Premises are so damaged by fire or other casualty that tenantability is only partially disturbed, this Lease shall not terminate and Landlord shall restore the Premises to at least their previous condition within a reasonable time. For that purpose, Landlord and its agents may enter the Premises, and rent shall abate in proportion and duration equal to the partial untenantability of the Premises. For this purpose, Landlord shall determine the proportion and duration of the partial untenantability, and its determination shall be binding upon both parties. No claims shall be made by or allowed to Tenant by reason of any inconvenience or annoyance arising from the repair work. Landlord shall be entitled to all insurance proceeds, including any proceeds from Tenant's insurance policies to the extent the same cover Building fixtures, equipment, systems and materials that need to be replaced as part of the repair of the Premises.

18.3.  **Removal of Rubbish and Property.** In the event the Premises suffer any casualty damage, Tenant shall within ten days remove any debris or rubbish, remove its personal Premises from the damaged Premises, and clean the damaged Premises to facilitate repair or restoring operations.

19.  **Default By Landlord.** Tenant shall give Landlord written notice of any default by Landlord. If (a) the default is not cured within thirty (30) days after Landlord receives the written notice, or (b) Landlord does not within that thirty (30)-day time period take actions which, if continued with reasonable diligence, will cure the default, then Tenant at its election may declare this Lease terminated after an additional period of thirty days. If this Lease is rightfully terminated in accordance with this section, rent shall be paid only to the end of the second thirty (30)-day period. Tenant shall look solely to Landlord's equity in the Premises for satisfaction of any remedies of Tenant in the event of Landlord's breach.

20.  **Default By Tenant.**

20.1.  **Events of Default.** Tenant will be in default under this Lease upon the happening of any one or more of the following events:

- 9 -

(a) Failure of Tenant to timely make any rent payment within ten (10) days after notification by Landlord or to fully perform any obligation contained in this Lease.

(b) Any warranty, representation or statement made or furnished to Landlord by or on behalf of Tenant for the purpose of inducing the execution of this Lease, or any other agreement between the parties proves to have been false in any material respect when made or furnished.

(c) Tenant is dissolved or its existence terminated; Tenant becomes insolvent, its business fails, or a receiver is appointed for any of Tenant's Premises; Tenant is generally not paying its debts as they become due; or Tenant makes an assignment for the benefit of its creditors or is the subject of any voluntary or involuntary bankruptcy or insolvency proceeding.

(d) Any of the occurrences set forth in this section above occurs with respect to any guarantor or surety of Tenant's obligations.

(e) Tenant abandons the Premises, or the Premises or Tenant's leasehold interest in the Premises are attached or taken under any court order or writ of execution.

20.2. **Rights of Landlord.** If Tenant defaults, Landlord may re-enter the Premises and take possession of the Premises, with or without force or legal process, and without notice or demand. The service of notice, demand and legal process are waived by Tenant. Upon its entry, Landlord may prevent Tenant's entry upon the Premises, without being liable to Tenant for any damages or for prosecution. Without limitation, Landlord may enforce its rights by an action for rent and possession, unlawful detainer, or other legal remedy. Tenant agrees that, notwithstanding Landlord's re-entry and possession of the Premises, Tenant shall remain liable for and shall pay Landlord an amount equal to the entire rent payable to the end of the then-applicable term of this Lease. This amount may either (i) be accelerated and become payable at once, or (ii) become due and be payable monthly, at the sole option of Landlord. In addition, Tenant shall be liable for and shall pay to Landlord any loss or deficiency sustained by Landlord because of Tenant's default.

20.3. **Reletting Premises.** Notwithstanding Landlord's re-entry and possession of the Premises, Landlord upon Tenant's default shall have the right, without notice to Tenant, and without terminating this Lease, to make alterations and repairs for the purpose of reletting the Premises. Landlord may relet or attempt to relet the Premises or any part of the Premises for the remainder of the then-applicable Lease term or for any longer or shorter period as opportunity may offer, to such persons and at such rent as may be obtained. Nothing in this Lease shall require Landlord to relet or make any attempt to relet the Premises, and any reletting shall be done by Landlord as agent for Tenant. In case the Premises are relet, Tenant shall pay the difference between the amount of rent

- 10 -

payable during the remainder of the term and the net rent actually received by Landlord during the term after deducting all expenses for repairs, alterations, recovering possession, and reletting the same, which difference shall either (i) accrue and be payable monthly, or (ii) be accelerated and become payable at once, at Landlord's sole option.

20.4.   **No Termination.**   No actions taken by Landlord after Tenant's default shall be construed as indicating a termination of this Lease. This Lease shall remain in full force and effect and shall not be terminated unless Landlord so elects in writing.

20.5.   **Cure.**   At Landlord's election, Landlord may cure any default of Tenant by expending money, contracting for the making of repairs, purchasing insurance, or by any other actions. If Landlord takes any such actions, Tenant will immediately upon demand reimburse Landlord for all of Landlord's expenses. All such expenses shall bear interest from the dates they are incurred until the dates they are paid, at an annual rate equal to the rate set forth in Section 3.2 above.

20.6.   **Costs and Expenses.**   Landlord shall be entitled to recover from Tenant all of Landlord's expenses in exercising any of its rights under this Lease, including without limitation Landlord's attorney's fees and expenses.

20.7.   **Remedies Cumulative.**   All of Landlord' remedies are cumulative, and may be exercised successively or concurrently, at Landlord's election.

20.8.   **No Counterclaims.**   Tenant agrees not to make any counterclaim of any nature in any proceedings brought in connection with this Lease. This agreement shall not, however, prohibit the maintenance of any claim in a separate action. Tenant waives any rights it may have to redeem the Premises from any re-entry and possession by Landlord. Any breaches of any covenants of this Lease shall be material breaches entitling Landlord to its remedies, regardless of the extent of actual damage.

21.     **Waivers.**   Any waiver, consent or approval on the part of Landlord must be in writing, and shall be effective only to the extent specifically set forth in the writing. No delay or omission by Landlord in the exercise of any right or remedy with respect to any one occasion shall impair Landlord's ability to exercise the right or remedy in the same or on another occasion.

22.     **Notices.**   All notices or other communications shall be in writing signed by the sender, and shall either be (a) personally delivered or (b) mailed by certified mail, at or to the following addresses:

Landlord:     New Lifestyles, Inc.
              c/o Kenneth L. Cuave, President
              P. O. Box 64
              Winchester, VA  22604
              (540) 722-4521
              drkcuave@newlifestyle.net

- 11 -

24849739v1

Copy To:    William A. Truban, Jr.
            Owen and Truban, PLC
            P. O. Box 267
            Winchester, VA  22604
            (540) 678-0995
            btruban@owentruban.com

Tenant:     CALO Young Adult - Winchester, LLC
            P.O. Box 1810
            Lake Ozark, Missouri 65049

Either party may change the address by written notice to the other. Notices shall be effective when received (if personally delivered) or when deposited in the United States Mail (if mailed by certified mail), or if sent via email, upon receipt of a reply, email confirming such notice has been received.

     23.    **Return of Premises.**

       23.1.  **Condition of Premises.** At the termination of this Lease, Tenant agrees to deliver to Landlord the Premises and all mechanical systems and all equipment and fixtures thereon in good working order and condition.

       23.2.  **Holdover Tenancy.** Should Tenant fail to vacate the Premises at the termination of this Lease, Tenant shall pay for each day of the holdover period either (a) twice the then-applicable rent, or (b) a current fair market rent for the Premises (as determined by Landlord in its sole judgment), whichever is higher. All the terms and provisions of this Lease shall continue to apply. Tenant will be a tenant at will during the holdover period. Nothing in this section shall be a waiver of or preclude the exercise of Landlord's remedies for Tenant's default. Should Tenant's holdover prevent Landlord from fulfilling the terms of another Lease, Tenant shall defend and Indemnify Landlord from all direct and consequential damages for which Landlord may be liable, or which Landlord may suffer, as a result thereof.

     24.    **Quiet Enjoyment.** Neither Landlord nor Landlord's successors or assigns will disturb Tenant in its quiet enjoyment of the Premises.

     25.    **Indemnity.** Tenant shall indemnify, defend, and hold harmless Landlord from and against any and all damage, expense, claim, liability or loss including reasonable attorneys' fees arising out of or in any way connected to any condition occurring on the Premises or arising out of any use of the Premises during the term of this Lease. This duty to indemnify and defend shall include but shall not be limited to damages, costs, liability, loss and expense including professional consultant, engineering or attorneys' fees incurred in responding to federal, state, or local laws, strict liability, or common law. Tenant shall ensure that its liability insurance policy covers its obligations under this indemnity agreement.

- 12 -

26.     **Waiver of Subrogation.** Landlord and Tenant each respectively waive all rights of recovery against the other and the other's agents, employees, permitted licenses and assignees, for any loss or damage to Premises or injury to or death of persons, to the extent the same is covered or indemnified by proceeds of any insurance policy which either of the parties hereunder is required to carry under the terms of this Lease (whether or not) such party is actually maintaining such insurance coverage), or for which reimbursement is otherwise received. This agreement, however, shall apply only so long as the parties' respective insurance companies expressly concur in this agreement and waive all subrogation rights. Each party shall have a continuing obligation to notify the other party if these waivers are not granted. Nothing in this section shall impose any greater liability upon the Landlord than would have existed in the absence of this section. The parties specifically recognize and acknowledge that the waivers contained herein are and shall be effective even though such claims may arise as a result of the negligence of the party being released hereunder, or such party's agents, officers or employees.

27.     **Attornment.** Tenant agrees to and does attorn to any successor to Landlord's interest in all or any part of the Premises, including without limitation any purchaser at any foreclosure sale of all or any part of the Premises.

28.     **Owner.** Owner joins in this lease and agrees that so long as Landlord is renting the above Property to Tenant, Owner will lease the same to Landlord. Furthermore, if Tenant exercises any rights under Sections 13 (Right of First Refusal) and 14 (Option), above, Owner agrees to be bound by the terms and conditions of this lease so as to convey such Property under such terms (just as if Owner were the Landlord hereunder). Owner warrants and represents it is owned 100% by Kenneth Cuave.

29.     **Successors and Assigns.** This Lease shall inure to the benefit of and be binding upon the heirs, estates, executors, administrators, receivers, custodians, successors and (in the case of Tenant, permitted) assigns of the respective parties.

29.     **Memorandum of Lease.** Neither this Lease nor any memorandum or other evidence thereof shall be filed of public record by either party.

- 13 -

INTENDING to be fully bound, the parties have executed this Lease the day and year above written.

Landlord:                        NEW LIFESTYLES, INC.

                                 a Virginia corporation

                                 By: _____
                                 Kenneth Cuave, President

Tenant:                          CALO YOUNG ADULTS - WINCHESTER, LLC

                                 a Delaware limited liability company

                                 By: _____
                                 Print Name _____
                                 Print Title: _____

Owner:                           CUAVE FAMILY PROPERTIES, LLC

                                 By: _____
                                 Kenneth Cuave, Member

- 14 -

24849739v1

**Exhibit A**

**Tax Map Info and Deed For Property**

24849739v1
DRAFT 11/19/15 3:13 PM

**Renfo Property Information Form**

Exhibit A

## Property Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Area** WINC | **Dist** | | | **Rec #** 2,535.01 | | **Map Id** 172-01-C- 1 | |
| **Description** 230 WEST BOSCAWEN STREET | | | | | | | |
| **Address** 230 W BOSCAWEN ST | | | | | | **Acres** 0.28 | |
| **Land Value** 180,000 | | **Zoning** B1 | | | **Elec / Gas** Y / Y | |
| **Bldg Value** 354,700 | | **Esmt / ROW** PAVE / PUBL | | | **Water / Sewer** PUBL / PUBL | |
| **Total Value** 534,700 | | **Character** OPEN | | | **Deed Ref Bk / Pg** 040000300 | |
| **LU Value** | | **Land Use** COMM | | | **Sale Price / Parcels** 575,000 | |
| **Tax Amount** 4,865.77 | | **Occupancy** COMM | | | **Sale Date** 1/22/2004 | |

## Owner Information

**Name** CUAVE FAMILY PROPERTIES LLC

**Address** PO BOX 84

WINCHESTER, VA 22604

## Building Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Bldg Sq Ft** 6,716 | | **Stories** 2 | **Units** | | **Year Built** 1891 | |
| **Bsmt Sq Ft** 1,797 | | **Air Cond** Y | **Garage / #** | | **Condition** GOOD | |
| **Bsmt Fin SF** | | **Fireplace** | **Carport / #** | | **Rooms** | |
| **Basement** PART | | **Flue** | **Heat** FHA | | **Bedrooms** | |
| **Foundation** BRIK | | **Roof Type** HIP | **Fuel** GAS | | **Fullbaths** | |
| **Walls Ex / In** BRIK / DRWL | | **Roof Matl** METL | **Floor** COMB | | **Halfbaths** 4 | |

The information contained herein is deemed reliable but NOT GUARANTEED. The official city or county records must be checked to verify the accuracy of this information.

040000300                          000   0059

THIS DEED, made and dated this 22 day of January, 2004, by and between HOLLY HOUSE, L.C., a Virginia limited liability company, hereinafter called the Grantor; and CUAVE FAMILY PROPERTIES, L.L.C., a Virginia limited liability company, hereinafter called the Grantee.

WITNESSETH: That for and in consideration of the sum of Ten Dollars, and other valuable consideration, the receipt of which is hereby acknowledged, the Grantor does hereby grant and convey with General Warranty and English covenants of title unto the Grantee, in fee simple, the following property:

All that certain lot or parcel of land, lying and being situate on the northeast corner of the intersection of Boscawen Street and Stewart Street, in the City of Winchester, Virginia, and designated as 230 West Boscawen Street; bounded on the south by Boscawen Street, on the west by North Stewart Street, on the north by an alley and on the east by the property now or formerly belonging to Lelia McGuire Hyde; AND BEING the same property conveyed from Robert C. Green, Jr. and W. Jackson Helm to Holly House Property Partnership by deed dated December 21, 1984, of record in the Clerk's Office of the Circuit Court of the City of Winchester, Virginia in Deed Book 189, at Page 501; Holly House Property Partnership later converted to Holly House, L.C.

Reference is hereby made to the aforesaid instruments and the attachments and the references therein contained, for a more particular description of the property hereby conveyed.

This conveyance is made subject to all easements, rights of way and restrictions of record, if any, affecting the subject property.

Grantee Address: 711 Church, Cameron Str.
Winchester, VA 22601
Consideration: #575,000.00
Tax Map No: TM# 173-01-C-1

GREGORY A.
HUTCHINSON
ATTORNEY AT LAW
24 S. BRADDOCK ST.
WINCHESTER, VA 22601

WITNESS the following signature and seal:

000   0060

HOLLY HOUSE, L.C.

By: _Duane A. Wernecke_ (SEAL)
DUANE WERNECKE, Practice Administrator

STATE OF VIRGINIA,

CITY/COUNTY OF _Winchester_, to-wit:

The foregoing instrument was acknowledged before me in my City/County and State this __22__ day of January, 2004, by DUANE WERNECKE, Practice Administrator of HOLLY HOUSE, L.C.

My Commission Expires: _May 31, 2005_

_Mary Pauls Wilson_
NOTARY PUBLIC

INSTRUMENT #040000381
RECORDED IN THE CLERK'S OFFICE OF
WINCHESTER CW-
JANUARY 22, 2004 AT 03:44PM
$575.00 GRANTOR TAX WAS PAID AS
REQUIRED BY SEC 58.1-802 OF THE VA CODE
STATE:    $287.50  LOCAL:    $287.50
TERRY H. WHITTLE, CLERK

BY: _Deborah L. Tayne_ (DC)